# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# (RICHMOND DIVISION)

| | |
|---|---|
| CHEMTREAT, INC., <br> 5640 Cox Road <br> Glen Allen, VA 23060 <br><br> Plaintiff, <br> vs. <br><br> BEAZLEY FURLONGE LIMITED, <br> Plantation Place South <br> 60 Great Tower Street <br> London EC3R 5AD <br> United Kingdom <br><br> Defendant. | Civil No: 3:19-cv-00063-MHL |

## COMPLAINT

For its Complaint, ChemTreat, Inc. states and alleges as follows:

### STATEMENT OF THE CASE

1. ChemTreat brings this action to enforce its right to a defense and to indemnity for claims asserted against it in a state court personal injury action.

### PARTIES

2. ChemTreat is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business located at 5640 Cox Road, Glen Allen, Virginia 23060.

3. Syndicate number AFB 2623, signing for 49.20% of the risk, is the lead underwriter (or "contract leader" in the parlance of the Policy) and representative of a consortium of London market insurers that subscribed to the insurance policy that is at issue in this action. The managing agent for Syndicate AFB 2623 is defendant Beazley

Furlonge Limited and its NAIC alien ID no. is AA1128623. (Syndicate nos. 2623 and 623, that share Beazley Furlonge Limited as managing agent, are sometimes referred to as "Beazley".)

4. The other London market insurers that subscribed to the policy at issue are syndicate nos.: (a) AFB 623 (10.80%), whose managing agent is also Beazley Furlonge Limited; (b) FDY 435 (14.63%), whose managing agent is Faraday Underwriting Limited and NAIC alien ID no. is AA1126435; (c) AML 2001 (7.32%), whose managing agent is MS Amin Underwriting Limited and NAIC alien ID no. is AA1126623; (d) AUW 609 (15.61%), whose managing agent is Atrium Underwriters Limited and NAIC alien ID no. is AA1126609; and (e) SAM 727 (2.44%), whose managing agent is S.A. Meacock & Company Limited and NAIC alien ID no. is AA1128001.

5. Each of these syndicates is not organized and existing under the laws of the Commonwealth of Virginia. Likewise, each of these syndicates is not a citizen and resident of, or an entity with its or its managing agent's principal place of business located in, the Commonwealth of Virginia. (ChemTreat shall refer to all of the syndicates on the policy at issue as the "Underwriters".)

6. Each syndicate is severally liable on the risk.

## JURIDICTION AND VENUE

7. This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship where this is an action between: (a) a citizen of a state; and (b) citizens or subjects of a foreign state (where those citizens or subjects of a foreign state are not lawfully admitted for

permanent residence in the United States and are not domiciled in the same state as ChemTreat).  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(3) and 1391(c)(3).

9. Under the terms of the Policy, paragraph XXVIII governing "Service of Suit," the Underwriters "agreed that in the event of a failure of Underwriters hereon to pay any amount claimed to be due under this Insurance, Underwriters hereon, at the request of [ChemTreat], shall submit to the jurisdiction of a court of competent jurisdiction within the United States."

10. Also under the terms of the Policy, paragraph XXVIII, the Underwriters further agreed that "service of process in such suit may be made upon Underwriters' representative, designated in Item 11 of the Declarations", and the Underwriters authorized and directed that representative to accept service.  The referenced Item 11 designates the Underwriters' representative as Mendes & Mount, 750 Seventh Avenue, New York, NY 10019-6929.

11. Each of the defendant London Market insurance syndicates is an alien insurer not authorized (not licensed) to issue policies in either New York or Virginia to insureds except through a licensed surplus lines broker.  The defendant issued ChemTreat the Policy in New York through surplus lines broker Robert Salinardo (a Managing Director at Marsh in New York City), license no. 108379, registered at the address of 1166 Avenue of the Americas, New York, NY 10036-2708.

## STATEMENT OF FACTS

### I.     ChemTreat's Business

12.     For over 40 years, ChemTreat has been a leader in industrial water treatment services and process optimization.  Among its products and services are chemical programs, engineering services, environmental solutions and laboratory services.  ChemTreat delivers value to its customers by providing outstanding service, high-quality products and superior technical expertise.

13.     One of ChemTreat's customers was Valley Proteins, Inc., a commercial poultry processing facility located in Accomac, Virginia.  Valley Proteins had a pressure vessel associated with a boiler system located at its facility, and ChemTreat provided industrial water treatment services for that boiler system.

14.     As part of the services ChemTreat provides to its customers, including the services it provided to Valley Proteins, ChemTreat's field personnel perform on-site services.  In providing those on-site services, ChemTreat's field personnel bring to the company's customers, and here brought to Valley Proteins, their specialized knowledge, labor and skill, where the labor or skill they bring to bear is predominantly mental or intellectual (and is not predominantly physical or manual).

### II.    Pertinent Policy Provisions

15.     The Underwriters issued ChemTreat a policy of professional indemnity insurance, with a policy period of July 1, 2017 to July 1, 2018, policy no. B0509FINPS1700245 (the "Policy").  The Policy's limit of liability, per Claim, is $2 million (including Claims Expenses).  ChemTreat attaches to this Complaint a true and correct copy of the Policy as Exhibit A.

16. The Policy is a claims made and reported liability insurance policy. The Policy specifically states that it "applies only to **Claims** first made against the **Assured** during the **Policy Period**".

### A. The Underwriters' Duty to Defend

17. In the Policy provision governing the defense, settlement, and investigation of claims, it states:

> The Underwriters shall have the right and duty to defend, subject to the Limit of Liability, exclusions and other terms and conditions of this Policy any **Claim** against the **Assured** seeking **Damages** which are payable under the terms of this Policy, even if the allegations of the **Claim** are groundless, false or fraudulent.

18. The Policy defines a Claim as "a demand . . . for money or services, including the service of suit or institution of arbitration proceedings". (It goes on to include in the definition of a Claim "a threat or initiation of a suit seeking injunctive relief (meaning a temporary restraining order or a preliminary or permanent injunction)." That aspect of the definition does not apply to the facts of this claim and this action.)

### B. The Underwriters' Obligation to Indemnify

19. In listing the "Risk Details" for the coverage it affords, the Policy states: "This policy provides coverage for consulting services [ChemTreat] provided to third parties for a fee."

20. In Insuring Agreement I.A. of the Policy, the Underwriters agreed:

> To pay on behalf of the **Assured Damages** and **Claims Expenses**, in excess of the Deductible, which the **Assured** shall become legally obligated to pay because of any Claim first made against the **Assured** during the policy period . . . arising out of any negligent act, error or omission in rendering or failure to render **Professional Services** on or after [February 18, 2005] . . . by the **Assured** or by any person . . . for whose negligent act, error or omission the **Assured Organization** is legally responsible."

5

21. The Policy Deductible is $150,000 for each Claim, including Damages and Claims Expenses.

22. The Policy defines Damages as "a monetary judgment, award or settlement of compensatory damages, including any pre-judgment and/or post-judgment interest thereon."

23. The Policy defines Claims Expenses as "reasonable and necessary fees charged by an attorney designated or consented to by the Underwriters."

24. The Policy defines "Professional Services" as:

> those services performed for others by or on behalf of the **Assured Organization** in the practice of architecture, engineering, land surveying, landscape architecture, interior design, construction management, environmental consulting, [or] Laboratory Services.

### III. Information ChemTreat Received and ChemTreat's Notice to Underwriters of the Claim

#### A. Information ChemTreat Received

25. ChemTreat received three letters, dated March 15, 2016, May 5, 2017 and June 5, 2017, on which the Underwriters now rely as somehow providing notice to ChemTreat of a Claim or a Circumstance.

26. The first letter, dated March 15, 2016, is from counsel for Mid-South Steam Boiler and Engineering Company, Inc. The basis for that letter was counsel's statements that

> We have been placed on notice of potential subrogation claims by various insurance carriers for Valley Proteins, alleging that a pressure vessel manufactured by Mid-South was involved in the explosion [at Valley Proteins]. It is our understanding that you may have inspected, tested, and/or serviced the boiler system associated with the pressure vessel. Accordingly, we are writing to place you on notice of potential claims Mid-South may have against

6

> you, including, but not limited to, claims for indemnity and/or contribution.

Thus, this insurance defense counsel appointed to represent Mid-South, based solely on his speculation and without any factual basis, is asking ChemTreat to be aware of potential claims Mid-South's insurer might bring for indemnity and contribution.

27. While this first letter asks ChemTreat to place its insurance carriers on notice of these potential claims, and to preserve documents relating to any services or products ChemTreat provided to Valley Proteins; notably, it does not identify any action or omission by ChemTreat or any one of its employees that could be the basis for any liability, and does not make a demand against ChemTreat.

28. The second letter, dated May 5, 2017, advises that Valley Proteins had sued Mid-South, and repeats that Mid-South may have a claim for indemnity and/or contribution and requests that ChemTreat notify its carriers and that it continue to preserve documents. Here, too, this second letter does not identify any action or omission by ChemTreat or any one of its employees that could be the basis for any liability, and does not make a demand against ChemTreat.

29. The third letter, dated June 5, 2017, is from counsel for the injured Valley Proteins employee. In it, the sole request is that ChemTreat preserve documents relating to the Valley Proteins facility (albeit with much specificity identifying the types of documents as compared to the previous counsel's letters).

30. Given the fact that the injured person's counsel had not asserted that ChemTreat or any one of its employees had done anything wrong, asserted no claim against ChemTreat, and made no demand for money or services as some form of compensation or redress, a reasonable person would view this as an effort to preserve

7

third-party documents that the injured party believed might be relevant to his claims against Valley Proteins and Mid-South.

31. These three letters were not any manner of accusation that ChemTreat had engaged in some manner of wrongdoing, error or omission; did not make a demand for relief (in the form of either money or services); and were not a threat of a future lawsuit against ChemTreat. They were, at best, requests to preserve information and documents.

32. These three letters sent to ChemTreat do not assert that it or any of its employees had committed any manner of allegedly negligent act, error or omission, or any other wrongdoing. These letters did not give ChemTreat knowledge that there was any manner of claim being asserted against it or a reasonable possibility that a claim would be asserted against it.

33. Further, viewed objectively, a reasonable insured having received the three letters described above, would not view them as asserting a Claim or Circumstance, and would not know or could not reasonably foresee that a claim would be made against it.

### B. ChemTreat's Notice of the Claim Asserted Against It

34. The Policy's notice provisions require that the Assured "forward [written notice] as soon as practicable" of "any **Claim** [] made against the **Assured**", and that the Assured also provide copies of "every demand, notice, summons or other process received by the **Assured**" along with the notice of such Claim.

35. On October 12, 2017, ChemTreat's agent for service of process forwarded to ChemTreat a copy of a Complaint filed in the Henrico County Circuit Court, Virginia,

and styled *Windsor v. Hartford Steam Boiler Inspection & Insurance Company, et al.*, Case no. 087CL1700358000, in which the plaintiff named ChemTreat as one of the defendants.

36. On October 17, 2017, Marsh USA, Inc. provided written notice to the claims department of Marsh Ltd. In the United Kingdom providing notice of the *Windsor* suit and claim in accordance with the reporting provisions of the Policy.

37. Also on October 12, 2017, ChemTreat's agent for service of process forwarded to it a copy of a Subpoena in a Civil Case directing ChemTreat to produce documents, which subpoena counsel for the defendant issued in an action pending in the United States District Court for the Eastern District of Virginia, Norfolk Division, styled *Valley Proteins, Inc. v. Mid-South Steam Boiler & Engineering Co.*, Case no. 2:17-cv-19-HCM-DEM. That subpoena directed ChemTreat to produce:

> Copies of any and all documents regarding the boilers and pressure vessel systems located at the Perdue and/or Valley Proteins Plant located at 22528 Lankford Highway, Accomac, VA 23301, including, but not limited to, [*sic*] inspections, maintenance, visits, repairs, recommendations work orders, proposals, reports, records, service documents, invoices, correspondence, billing, investigative files, notes, drawings, videos, photographs, witness statements, incident and accident reports, interoffice notes and memos, progress reports, case summary reports, case file diary logs, fines and penalties, inspection narratives, reports of corrective actions/abatement verifications, etc. for any and all times.

(Demonstrating that it was a form of subpoena to produce that was in large part, not applicable to ChemTreat, it included a notice to providers advising that a copy had been provided to "your patient" or your "patient's counsel".)

38. On October 25, 2017 Marsh USA, Inc. supplemented its previous notice to Marsh Ltd. by providing a copy of the Subpoena.

9

39. ChemTreat provided the Underwriters notice of the Claim asserted against it within a reasonable time in view of all of the circumstances.

40. While the Underwriters have challenged the timeliness of ChemTreat's notice, the Underwriters have not identified any prejudice to them as a result of any such allegedly late notice.

41. Given the nature of the claims asserted, the Underwriters cannot identify any prejudice that would excuse their obligation to perform under the Policy they issued.

**IV.  The Underwriters' Response to ChemTreat's Tender of Defense and Request for Indemnity**

42. The Underwriters are obligated to interpret and apply the provisions of the Policy liberally and in favor of the existence of a duty to defend and the obligation to indemnify their insured.

43. The Underwriters denied any duty to defend and have denied any obligation to indemnify ChemTreat. They did so for three reasons, and for each of those reasons rely on the three letters ChemTreat received as set forth in paragraphs 26, 28 and 29, above.

44. First, the Underwriters rely on the Policy's Excluding Matters Exclusion. That exclusion provides:

> This Policy shall not indemnify the Insured in respect of any claim, loss, liability or expense arising out of any claim of Circumstance (a) known to the Insured prior to the inception of this Policy Period or which in the reasonable opinion of the Insurers ought to have been known . . . ."

Under Section VIII.E of the Policy, "Circumstance" means "any fact, event or situation that could reasonably be the basis for a Claim."

10

45. The Underwriters' position is that the *Windsor* state court complaint arises out of a Circumstance (*i.e.*, the explosion: a fact, event or situation that could reasonably be the basis for a Claim) that was known to ChemTreat (and which, in what Underwriters' assert was their reasonable opinion, ought to have been known to ChemTreat) prior to the Policy's inception on July 1, 2017.

46. Second, the Underwriters rely on the Policy's Retroactive Limitation Clause. That clause provides: "There shall be no liability hereunder in respect of any claim: . . . (b) arising out of any circumstance or occurrence known to the Assured prior to the inception hereof and not disclosed to the Underwriters at inception."

47. The Underwriters' position is that the *Windsor* complaint arises out of a circumstance or occurrence (*i.e.*, the explosion) known to ChemTreat prior to the Policy's inception, and was something that was not disclosed to Underwriters in the Miscellaneous Professional Indemnity Proposal Form signed June 13, 2017.

48. The Miscellaneous Professional Indemnity Proposal Form ChemTreat submitted as part of the application process to secure coverage under the Policy (which was signed on June 13, 2017) responded "No" to the following question:

> 5. After enquiry, is the Applicant or any subsidiary or any person intended to be covered aware of any negligent act, error or omission or any other fact, complaint, circumstance, or situation which may be expected to give rise to a claim against the Applicant or any subsidiary or any person intended to be covered?

49. Third, the Underwriters rely on the exclusion found at Section VI.B.1.(a) of the Policy. That exclusion precludes coverage for any Claim:

> 1. arising out of or resulting from any act, error or omission . . . committed or arising prior to the inception date of this Insurance:

      (a)    if any director, officer, principal, partner, insurance manager or any member of the risk management or legal department of the Assured Organization on or before the inception date knew or could have reasonably foreseen that such act, error or omission . . . might be expected to be the basis of a Claim[.]

50.    The Underwriters' position is that the *Windsor* complaint arises out of or results from ChemTreat's services performed before the Policy's July 1, 2017 inception, and that the three letters gave ChemTreat's directors, officers, principals, partners, insurance managers, and/or members of ChemTreat's risk management or legal department knowledge and reason to foresee that ChemTreat's services at the Plant might be expected to be the basis of a Claim.

## V.    Miscellaneous Policy Provisions and ChemTreat's Compliance With Conditions Precedent

51.    The Policy provides that any dispute concerning the interpretation of the Policy shall be governed by the laws of New York.

52.    During the Policy period, ChemTreat at all times maintained general liability, products liability and completed operations liability insurance with a limit of liability at least equal to the Policy's limit of liability.

53.    All conditions precedent or concurrent to ChemTreat's rights under the Policy have occurred, have been met or performed, or otherwise have been fulfilled or waived.

### **FIRST CLAIM FOR RELIEF**

54.    ChemTreat repeats and realleges the allegations contained in paragraphs 1 through 53 as if they were set forth fully herein.

55. ChemTreat timely requested that the Underwriters provide it with a defense and indemnify it against any loss.

56. The three bases on which the Underwriters denied defense and indemnity are erroneous for reasons including, but not limited to, those that follow.

### A. The Excluding Matters Exclusion

57. Under the Excluding Matters Exclusion, the Policy language raises two issues: first, whether there was any Claim or Circumstance known to ChemTreat prior to the inception of this Policy on July 1, 2017; or, second whether there was any claim or Circumstance which, in the reasonable opinion of the Insurers, ChemTreat ought to have known.

58. There was not a Claim as the policy defines that term, so the questions further narrow to whether ChemTreat had knowledge of a Circumstance, defined as "any fact, event or situation that could reasonably be the basis for a Claim". In assessing whether there was a Circumstance, the proper analysis is what the insured, ChemTreat, subjectively knew.

59. There was nothing in the first two letters identifying any manner of wrongdoing, negligence, error, omission, or other basis for responsibility by ChemTreat. These letters merely created the impression, as they would to any reasonable insured, that insurance defense counsel for the pressure vessel manufacturer was engaging in a routine effort to cast a wide net to preserve unknown speculative rights and documents if that counsel should later discovery some basis for those rights or need for those documents. For at least these reasons, those first two letters were not enough to be a Circumstance.

60. The third letter, from the injured person's lawyer, merely asked ChemTreat to preserve documents. A request to preserve documents is not a Circumstance.

61. It is not reasonable, on these facts, for the Underwriters to now apply 20/20 hindsight and declare that ChemTreat ought to have known that a Claim might be asserted against it.

### B. The Retroactive Limitation Clause

62. For this clause to apply, it requires that ChemTreat have known of a "circumstance or occurrence" before Policy inception.

63. The Underwriters' reliance on the Policy's Retroactive Limitation Clause is flawed because ChemTreat had no information that it had – or that anyone was claiming that it had – anything to do with the Windsor claim and alleged injury.

64. ChemTreat did not have any "expectation" that these letters would give rise to a claim against it for the simple reason that none of those letters identified some manner of wrongdoing, negligence, error, omission, or other basis for responsibility on ChemTreat's part.

### C. The Prior Notice / Prior Knowledge Exclusion

65. The Policy exclusion on which the Underwriters rely parallels the Retroactive Limitation Clause in that, for it to apply, the Underwriters must demonstrate that a ChemTreat representative, in one of the specified positions, "knew or could have reasonably foreseen that such act, error or omission . . . might be expected to be the basis of a Claim".

66. First and foremost, the three letters did not identify any act, error or omission by ChemTreat. The fact that ChemTreat may have provided services to the

facility's owner at which there was an accident did not give rise to any such expectation.

67. In addition, the Underwriters have never identified any "any director, officer, principal, partner, insurance manager or any member of the risk management or legal department" of ChemTreat that supposedly had any such expectation.

68. Instead, the Underwriters declined to defend and indemnify focusing on things that "might" be the basis of a Claim, and not on the required Policy language of what "might be expected". In their efforts to excuse their failures to comply with the Policy, the Underwriters attempt to examine through the lens of whether even remote events could, with hindsight, be something that could give rise to a claim vs. the required analysis of what was reasonably foreseeable to the insured prior to its receipt of the *Windsor* complaint.

### D. The Underwriters' Breach of Their Duty to Defend

69. Because the claims pleaded against ChemTreat in the *Windsor* state court action may rationally be said to fall within the Policy's coverage, the Underwriters were obligated to provide ChemTreat with a defense.

70. Because the Underwriters agreed to provide ChemTreat a separate, contractual defense, they are obliged to defend ChemTreat until such time as it is determined with certainty that the Policy does not provide coverage. If the Underwriters had in fact believed they had no duty to defend, they had the option of seeking a declaratory judgment with respect to the relevant policy provisions or exclusions and a certain determination as to whether they had the duty to defend. Here, they did not do so.

71. By declining to defend ChemTreat, the Underwriters waived any right they may have once had to select counsel or to challenge ChemTreat's selection of counsel to defend it.

72. To date, ChemTreat has incurred in excess of $500,000 in reasonable attorneys' fees and costs in defense of the *Windsor* state court action.

**E.     The Underwriters Breach of Their Obligation to Indemnify**

73. ChemTreat was when it received those letters (and remains today) not aware of any negligent act, error or omission that any Assured committed. There was nothing contained in any one of these letters that identified any fact, event or situation that ChemTreat could reasonably identify as a basis for a Claim, and ChemTreat had no expectation that there would be any manner of Claim arising here and/or on receipt of any one of the three letters. There was nothing in these letters of which any of the members of ChemTreat's management knew or could have reasonably foreseen or expected to be the basis of a Claim against ChemTreat.

74. The first two letters state an overly-aggressive and erroneous position (a position ChemTreat believes was one taken by panel defense counsel appointed by Mid-South's insurance carrier to protect against a future contingency and with no basis for expecting that contingency would actually arise) stating that the manufacturer may have claims based on a suit that had not at that time been filed, including potential claims for indemnity or contribution. The letters did not identify any act, error or omission attributed or attributable to ChemTreat that would or could be the basis for any Claim, and they do not advise of any Circumstance that would give rise to a Claim.

16

75. Further, because the Policy defines a Claim as either: (a) "a demand received by any Assured for money or services including the service of suit or institution of arbitration proceedings; or (b) "a threat or initiation of a suit seeking injunctive relief (meaning a temporary restraining order or a preliminary or permanent injunction)", there was no Claim here. The three letters do not make a demand for money or services from ChemTreat, do not serve a suit or institute an arbitration with claims against ChemTreat, and do not threaten injunctive relief.

76. There is nothing about the identified explosion that triggered any of the limitations or exclusions in the Policy because that fact, standing alone – and without any plausible tie to ChemTreat and/or some manner of negligent act, error or omission being asserted in any one of the three letters, and where ChemTreat has no knowledge of any act, omission or fact that would link it to the underlying explosion – is not something that could reasonably be the basis for a Claim against ChemTreat.

77. Similarly, requests to preserve "evidence" are not a Circumstance or a circumstance. They do not denote a Claim and are not a fact, event or situation that could reasonably be the basis for a Claim. Rather, these are simply a prophylactic request that serves as a basis for the requesting party to pursue others and establish, at best, that ChemTreat might be some manner of fact witness in the Windsor state court action. Here too, absent any stated basis stated that would implicate any act, error or omission by ChemTreat, they do not somehow elevate the letters to be a Circumstance or circumstance.

78. ChemTreat has been damaged as a direct and proximate result of the Underwriters' breaches of the Policy contract in an amount that it will prove at trial, but which is in excess of $75,000.

## SECOND CLAIM FOR RELIEF

79. ChemTreat repeats and realleges the allegations contained in paragraphs 1 through 78, as if they were set forth fully herein.

80. ChemTreat paid the Underwriters a premium of $185,000 for the policy.

81. Rather than making a good faith effort to provide the coverage for which ChemTreat paid under this very expensive policy, the Underwriters instead cast about for any possible excuse, no matter how weak or fanciful, to avoid their obligations to defend and indemnify ChemTreat.

82. The Underwriters' actions and omissions include: (a) failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; (b) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; (c) refusing arbitrarily and unreasonably to pay claims; and (d) compelling insureds to institute litigation to recover amounts due or that may come due under the Policy.

83. ChemTreat has been damaged as a direct and proximate result of the Underwriters' breaches of their duties to act reasonably and in good faith in an amount that it will prove at trial, but which is in excess of $75,000.

## **JURY DEMAND**

ChemTreat requests a trial by jury on all issues properly tried to a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, ChemTreat prays for the entry of a judgment against each of the Underwriters, severally and in proportion to the percentages of risk for which they each subscribed to the Policy, as follows:

    A.    Awarding damages for breach of contract in an amount ChemTreat will prove at trial, but which is in excess of $75,000;

    B.    Awarding direct and consequential damages for the Underwriters' breach of their obligations to act reasonably and in good faith, in an amount ChemTreat will prove at trial;

    C.    Awarding ChemTreat its reasonable attorneys' fees and costs incurred in enforcing its rights; and

    D.    Awarding such other and further relief as the Court determines is just and proper.

DATED: January 28, 2019.         Respectfully submitted,

    /s/ *Constantinos G. Panagopoulos*
Constantinos Panagopoulos (#33356)
BALLARD SPAHR LLP
1909 K Street, NW – 12th Floor
Washington, DC 20006-1157
Telephone: 202-661-2200
Facsimile: 202-661-2299
cgp@ballardspahr.com

and

Andrew J. Petrie
BALLARD SPAHR LLP
1225 Seventeenth Street – Suite 2300
Denver, Colorado 80202-5596
Telephone: 303-292-2400
Facsimile: 303-296-3956
petriea@ballardspahr.com
*(pro hac vice application to be filed)*

*Attorneys for Plaintiff ChemTreat, Inc.*