**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(RICHMOND DIVISION)**

| | | |
|---|---|---|
| CHEMTREAT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No.: 3:19-cv-00063 |
| vs. | ) | |
| | ) | |
| CERTAIN UNDERWRITERS AT | ) | |
| LLOYD'S OF LONDON SUBSCRIBING | ) | |
| TO POLICY NO. B0509FINPS1700245, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF CHEMTREAT, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56, Fed. R. Civ. P., ChemTreat, Inc. submits this Memorandum in

Support of its Motion for Summary Judgment.  ChemTreat seeks summary judgment because:

(1) Insuring Agreement I.A. covers claims arising out of the *Windsor* Action (Section B); (2)

Underwriters wrongfully denied coverage by relying on three Policy exclusions, none of which

exclude coverage under the undisputed material facts in this case (Sections C, D, E, F); and (3)

Underwriters had a duty to defend ChemTreat in the underlying *Windsor* Action, and ChemTreat

is therefore entitled to damages in an amount ChemTreat will prove at trial (Section G).

**Statement of Undisputed Material Facts**

1.      For many years, ChemTreat purchased annual errors and omissions ("E&O")

policies from Underwriters to protect itself against E&O claims.  [Exhibit A ("Borrero Aff.")

¶ 5].

2.      One of the E&O policies ChemTreat purchased from Underwriters is Policy No.

B0509FINPS1700245 (the "Policy"), which provided coverage for the policy period July 1, 2017

to July 1, 2018.  [Doc. 5 ¶ 15; Doc. 7 ¶ 15].  ChemTreat attaches a true and correct copy of the Policy as <u>Exhibit B</u>.  [Doc. 5 ¶ 15 & Exh. A; Doc. 7 ¶ 15].

3.      ChemTreat has at all relevant times paid Underwriters premiums due for the policies.  [Borrero Aff. ¶  6].

4.      ChemTreat paid Underwriters a premium of $185,000 for the Policy.  [*Id.* ¶ 7].

**A.      The December 24, 2015 Explosion**

5.      ChemTreat provided chemical water treatment products and services at a Valley Proteins, Inc. ("Valley Proteins") rendering facility in Accomac, Virginia (the "Facility"). [Borrero Aff. ¶ 8; Doc. 7 at Counterclaim ¶ 26].

6.      ChemTreat's services did not encompass any operation, maintenance or repair of Valley Proteins's equipment.  [Borrero Aff. ¶ 8].

7.      Instead, ChemTreat provided chemicals that Valley Proteins added to its water to adjust water chemistry and periodically tested the water chemistry, monitored chemical levels and feed rates, and adjusted the water treatment program as appropriate.  *Id.*

8.      On December 24, 2015, a pressure vessel tank (the "Tank") located at the Facility exploded.  [Doc. 7 at Counterclaim ¶¶ 24-25; Doc. 11 ¶¶ 24-25].

9.      Mid-South Steam Boiler and Engineering Co., Inc. ("Mid-South") designed and manufactured the Tank.  [Doc. 7 at Counterclaim ¶ 29; Doc. 11 ¶ 29].

10.     ChemTreat does not design, manufacture, or supply pressure vessel tanks, and it did not design, manufacture or supply the Tank.  [Borrero Aff. ¶  10].

11.     At the time of the Explosion, ChemTreat did not have personnel at the Valley Proteins facility.  [*Id.* ¶ 11].

12.     After the Explosion, Valley Proteins indicated that it intended to continue its relationship with ChemTreat.  [*Id.* ¶¶ 12-15 & Exhs. 1-2].

13.     On approximately December 29, 2015, at what appears to be Valley Proteins's request, a ChemTreat employee, Adam Hildebrant, contacted ChemTreat's billing department to suspend billing for ChemTreat's services at the Facility starting January 2016, until the Facility could be repaired and at which point Valley Proteins would again require ChemTreat's services. [*Id.* ¶¶13-14 & Exh. 1].

14.     Valley Proteins identified Mid-South as the entity responsible for the Explosion and alleged that a design and/or manufacturing defect with the Tank was the cause of the Explosion, not some manner of negligent water treatment.  [*See* Exhibit C ("Petrie Aff.") ¶¶ 7-11 & Exhs. 2-5].

15.     After the Explosion, ChemTreat proceeded on the basis that, if Valley Proteins had in any way believed that ChemTreat had caused or contributed to the cause of the Explosion, or if anyone had alleged that was the case, Valley Proteins would not have continued to use ChemTreat and would have asserted some manner of claim against ChemTreat.  [Borrero Aff. ¶ 16].

**B.      The Post-Explosion Letters**

16.     Because Valley Proteins had identified Mid-South as the entity responsible for the Explosion, Mid-South's insurance carrier retained defense counsel for its insured.  [*See* Exhibit D ("Blake Decl.") ¶ 6 & Exh. 1); Exhibit E ("Lown Decl.") ¶ 6].

17.     Between January 29 and April 28, 2016, Mid-South's counsel sent nearly identical letters to 37 different entities, based on Mid-South's belief that those entities "may have" somehow been involved in purchasing, designing, manufacturing, assembling, inspecting,

testing, servicing, or repairing the Tank. [*See* Blake Decl. ¶ 8 & Lown Decl. ¶ 9 (collectively authenticating 37 letters sent to third parties) & Exhs. 1-37].

18. None of the letters identify acts, errors, omissions, or other facts that would implicate any of the recipients in any manner of act or omission that could conceivably give rise to any liability. [*See generally* Blake Decl. ¶ 8 & Exhs. 1-11, 36-37; Lown Decl. ¶ 9 & Exhs. 12-35].

19. The letters provide only that Valley Proteins and Mid-South were still in the preliminary stages of investigating the cause of the explosion, that Mid-South might have "potential claims" against the recipients, including for indemnity and/or contribution, and contain Mid-South's request that the recipients notify their insurance carriers. [*See* Blake Decl. ¶ 8 & Exhs. 1-11, 36-37; Lown Decl. ¶ 9 & Exhs. 12-35].

20. When, on February 18, 2016, a recipient of one of the letters asked Mid-South's counsel for more information about the recipient's alleged involvement in the explosion, Mid-South's counsel responded: "As stated[,] this is a large site and the cause of the explosion is unknown. We are simply putting manufactures/suppliers on notice." [Lown Decl. ¶ 8 & Exh. 38].

21. ChemTreat was one of the 37 entities to whom Mid-South's counsel sent a letter. [*See* Lown Decl. ¶ 9(x) & Exh. 35].

22. The letter ChemTreat received from Mid-South's counsel was dated March 15, 2016. [Doc. 5 ¶ 26; Doc. 7 ¶ 26]. ChemTreat attaches a true and correct copy of that letter as Exhibit F. [Doc. 7 Counterclaim ¶ 29 & Exh. 2; Doc. 11 ¶ 29].

23. The March 15, 2016 Letter does not demand money or services from ChemTreat. [Petrie Aff. ¶ 6, Exh. 1 at RFA #4].

24.     The March 15, 2016 Letter makes no demand for monetary or other relief as against ChemTreat.  [*Id.*, RFA #8].

25.     On January 10, 2017, Valley Proteins filed a lawsuit against Mid-South in the Eastern District of Virginia, captioned *Valley Proteins, Inc. v. Mid-South Steam Boiler and Engineering Co., Inc.*, No. 17-cv-19-HCM-DEM (the "*Valley Proteins* Action").  [Petrie Aff. ¶ 7, 9 & Exh. 2].[1]

26.     ChemTreat was not named as a defendant in the *Valley Proteins* Action, nor was it referenced in any manner in Valley Proteins's complaint.  *Id.*

27.     On March 8, 2017, Valley Proteins filed an amended complaint in the *Valley Proteins* Action.  [*Id.* ¶ 10 & Exh. 4].

28.     On or around May 5, 2017, Mid-South's counsel sent ChemTreat a "supplement to" his March 15, 2016 letter.  [Doc. 5 ¶ 28; Doc. 7 Counterclaim ¶ 32 & Exh. 3; Doc. 11 ¶ 32; Borrero Aff. ¶ 21].  ChemTreat attaches a true and correct copy of that letter as Exhibit G.

29.     The May 5, 2017 Letter does not demand money or services from ChemTreat. [Petrie Aff. ¶ 6, Exh. 1 at RFA #4].

30.     The May 5, 2017 Letter makes no demand for monetary or other relief as against ChemTreat.  [*Id.*, RFA #14].

31.     The May 5, 2017 letter enclosed a copy of Valley Proteins's first amended complaint, and was ChemTreat's first notice of that action.  [*See* Exh. G].

---

[1]     ChemTreat asks that this Court take judicial notice of the fact of this public filing and the others that follow, and the contents of those complaints, pursuant to Fed. R. Evid. 201.  *See, e.g.*, *Lefkowitz v. Bank of N.Y.*, 676 F. Supp. 2d 229, 249 (S.D.N.Y. 2009) ("Judicial notice may encompass the status of other lawsuits, including in other courts, and the substance of papers filed in those actions.") (listing supporting cases).

32.     Valley Proteins's first amended complaint did not name or mention ChemTreat, or allege any acts, errors, omissions, or other specific facts that would implicate ChemTreat in any manner of alleged wrongdoing.  [*See generally* Petrie Aff. ¶ 10 & Exh. 4; Borrero Aff. ¶ 22].

33.     On May 19, 2017, Valley Proteins filed a second amended complaint in the *Valley Proteins* Action.  [Petrie Aff. ¶ 11 & Exh. 5].

34.     Valley Proteins's second amended complaint did not name or mention ChemTreat, or allege any acts, errors, omissions, or other specific facts that would implicate ChemTreat in any manner of alleged wrongdoing.  *Id.*

35.     ChemTreat received a letter dated June 5, 2017 from Terry Windsor's counsel.  [Doc. 5 ¶ 29; Doc. 7 ¶ 29].  ChemTreat attaches a true and correct copy of that letter as Exhibit H.  [Doc. 7 Counterclaim ¶ 37 & Exh. 4; Doc. 11 ¶ 37].

36.     The June 5, 2017 letter only demands "the preservation of certain evidence" related to the Tank.  [*See* Exh. H].[2]

37.     The June 5, 2017 Letter does not demand money or services from ChemTreat.  [Petrie Aff. ¶ 6 & Exh. 1 at RFA #17].

38.     The only request the June 5, 2017 Letter made is that ChemTreat preserve certain identified categories of documents relating to the Valley Proteins facility.  [*Id.*, RFA #16].

39.     The June 5, 2017 letter does not reference any acts, errors, omissions, or other specific facts that would implicate ChemTreat in any manner of alleged wrongdoing.  [*See generally* Exh. H].[3]

---

[2]     ChemTreat refers to the March 15, 2016 and May 5, 2017 letters from Mid-South, and the June 5, 2017 letter from Windsor's counsel, collectively as the "Post-Explosion Letters".

[3]     On June 5 and July 19, 2017, Windsor's counsel sent a letter nearly identical to those it had sent to ChemTreat to Tate Engineering, Inc., an entity that, according to the letter, Windsor's counsel believed "provided maintenance services in connection with" the Tank.  [*See* Exhibit J

**C.      ChemTreat Submits the Application for Renewal of Its E&O Policy**

40.      On June 13, 2017, ChemTreat submitted to Underwriters an application to renew

its E&O policy.  [Doc. 7 ¶ 20].  As part of its application for the Policy, ChemTreat submitted to

Underwriters a Miscellaneous Professional Indemnity Proposal Form, signed June 13, 2017

("Application").  [Doc. 7 Counterclaim ¶¶ 20, 57 & Exh. 1].  ChemTreat attaches a true and

correct copy of the Application as <u>Exhibit I</u>.  [*See id.*].

41.      Question 5 of the Underwriters' Application form, under the section titled

"Claims or circumstances", asks:

> After enquiry, is the Applicant [ChemTreat] or any subsidiary or any person
> intended to be covered aware of any negligent act, error or omission or any other
> fact, complaint, circumstance or situation which may be expected to give rise to a
> claim against the Applicant or any subsidiary or any person intended to be
> covered?

[Exh. I p. 6 of 7; *see also* Doc. 7 at Counterclaim ¶ 57].

42.      In response to question 5, ChemTreat marked the box indicating "No".  [Exh. I

p. 6 of 7; *see also* Doc. 7 at Counterclaim ¶ 57].

43.      As set forth in paragraphs 6-39 above, at the time ChemTreat submitted the

Application, ChemTreat was not aware of any acts, errors, omissions, or other facts that it

expected might give rise to a claim against it.  [*See also* Borrero Aff. ¶ 27].

**D.      The *Windsor* Action and ChemTreat's Notice of Claim**

44.      On or around October 10, 2017, Terry Windsor filed a lawsuit in Henrico County

Circuit Court, Virginia, styled *Windsor v. Hartford Steam Boiler Inspection & Insurance*

---

("Davis Decl.") ¶¶ 7-8 & Exhs. 1-2].  Windsor did not name Tate Engineering as a defendant or
mentioned it in any way in the *Windsor* Action, filed on October 10, 2017.  [*See* Borrero Aff. ¶
28 & Exh. 3].

*Company, et al.,* No. 087CL1700358000 ("*Windsor* Action"), naming ChemTreat as a defendant, among numerous other entities and individuals.  [Doc. 7 at Counterclaim ¶ 40; Doc. 11 ¶ 40].

45.     On October 12, 2017, ChemTreat's agent for service of process forwarded to ChemTreat a copy of the complaint filed in the *Windsor* Action.  [Borrero Aff. ¶ 28 & Exh. 3].

46.     ChemTreat promptly notified the broker, Marsh USA, Inc. ("Marsh"), of the *Windsor* Action, and on October 17, 2017, Marsh, on behalf of ChemTreat, provided notice to Underwriters of the *Windsor* Action enclosing a copy of the *Windsor* Complaint ("the Notice"). [Doc. 7 Counterclaim ¶ 47; Doc. 11 ¶ 47; Borrero Aff. ¶ 29].

47.     When Underwriters received the Notice, they had no knowledge of the Post-Explosion Letters or their contents.  [Petrie Aff. ¶ 6 & Exh. 1 at RFA #1-3].

48.     On December 15, 2017, Underwriters, through counsel, sent a letter to ChemTreat denying any coverage for the *Windsor* Action.  [Doc. 11 ¶ 50].

49.     Prior to ChemTreat's commencement of this action, Underwriters did not file an action seeking a declaration that Underwriters did not owe a duty to defend or to indemnify ChemTreat under the Policy.

**E.     The Pertinent Policy Provisions**

50.     Under Insuring Agreement I.A. of the Policy, Underwriters agreed to pay:

> Damages and Claims Expenses, in excess of the Deductible, which [ChemTreat] shall become legally obligated to pay because of any Claim first made against [ChemTreat] during the Policy Period . . . and reported to Underwriters . . . during the Policy Period . . . arising out of any negligent act, error or omission in rendering or failing to render Professional Services . . . by [ChemTreat] or by any person, including an independent contractor, for whose negligent act, error or omission [ChemTreat] is legally responsible.

[Exh. B § I.A., p. 8 of 55].

51.     The Policy[4] defines a Claim as "a demand . . . for money or services, including the service of suit or institution of arbitration proceedings." [*Id.* p. 24 of 55].

52.     The Policy provision governing the defense, settlement, and investigation of claims states:

> The Underwriters shall have the right and duty to defend, subject to the Limit of Liability, exclusions and other terms and conditions of this Policy, any Claim against [ChemTreat] seeking Damages which are payable under the terms of this Policy, even if the allegations of the Claim are groundless, false or fraudulent.

[*Id.* p. 13 of 55].

53.     Underwriters rely solely on three Policy exclusions as grounds for denying ChemTreat's request for coverage under Insuring Agreement I.A. of the Policy:  the "Retroactive Limitation" exclusion; the "Prior Knowledge, Prior Notice and Prior Acts" exclusion; and the "Excluding Matters Exclusion".  [*See* Doc. 7 Counterclaim ¶¶ 54-77].

54.     The Policy's "Retroactive Limitation Clause" provides:

> There shall be no liability hereunder in respect of any claim:
> . . .
> (b) arising out of any circumstance or occurrence known to [ChemTreat] prior to the inception hereof [July 1, 2017] and not disclosed to Underwriters at inception [July 1, 2017].

[*Id.* p. 38 of 55].

55.     The Policy's exclusion for "Prior Knowledge, Prior Notice and Prior Acts" provides, in pertinent part, that there is no coverage for any Claim:

> 1.     arising out of or resulting from any act, error or omission . . . committed or arising prior to the inception date of this Insurance:
>
> (a)     if any director, officer, principal, partner, insurance manager or any member of the risk management or legal

---

[4]     While the Policy puts defined terms in bold typeface, for ease of readability, ChemTreat has omitted the bold from those defined terms when it uses them herein.

> department of the Assured Organization on or before the
> inception date knew or could have reasonably foreseen that
> such act, error or omission . . . might be expected to be the
> basis of a Claim[.]

[*Id.* p. 16 of 55].

56.     The "Excluding Matters Exclusion" bars coverage for "any claim, loss, liability or expense arising out of any claim or Circumstance . . . known to the Insured prior to the inception of this policy Period [July 1, 2017] or which in the reasonable opinion of the Insurers ought to have been known".  [*Id.* p. 43 of 55].

57.     Underwriters admit that the Post-Explosion Letters do not meet the Policy's definition of a "Claim".  [Petrie Aff. ¶ 6 & Exh. 1 at RFA #9, 15, 18].

58.     The Policy defines "Circumstance" as "any fact, event or situation that could reasonably be the basis for a Claim."  [Exh. B at p. 24 of 55].

59.      "[A]ny dispute concerning the interpretation of this Policy shall be governed by the laws of New York."  [*Id.* pp. 3, 7, 36 and 38 of 55].

## Reasons Why ChemTreat Is Entitled to Summary Judgment

ChemTreat's motion for summary judgment is one the Court can and should resolve under Fed. R. Civ. P. 56 because it rests on:  (1) issues of contract interpretation that this Court can and should resolve as a matter of law; and (2) issues regarding material facts that are undisputed, as evidenced by Underwriters' admissions, or that Underwriters cannot reasonably dispute.

## A.     Basic Principles of Insurance Policy Construction

Courts must construe insurance policy exclusions narrowly.  To exclude certain coverage from its policy obligations, an insurer "'must do so in clear and unmistakable language[,]'" and "'[a]ny such . . . exceptions from policy coverage must be specific and clear in order to be

enforced.'" *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 12 N.Y.3d 302, 307 (2009) (quoting *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311 (1984)).   Courts cannot extend exclusions by interpretation or implication, but, instead, must accord them a strict and narrow construction.   *Id.*   A court will sustain a construction favorable to the insurer only if it is the sole construction the court can fairly place on the word(s) the insurer employed.   *Id.*

Where ambiguities exist in an insurance policy, courts must construe them "in favor of the insured and against the insurer."   *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2nd Cir. 2012); *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007).   "The principle that contractual ambiguities must be construed in favor of the insured applies with particular force where the ambiguity occurs 'in the language of an exclusion provision.'"   *Lighton Indus.*, 348 F. Supp. 3d at 184 (quoting *Vill. of Sylvan Beach, N.Y. v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995)).

## B.   Insuring Agreement I.A. Covers Claims Arising Out of the Windsor Action.

Under the Policy's Insuring Agreement I.A., Underwriters are obligated to pay on ChemTreat's behalf

> Damages and Claims Expenses, in excess of the Deductible, which [ChemTreat] shall become legally obligated to pay because of any Claim first made against [ChemTreat] during the Policy Period . . . and reported to Underwriters . . . during the Policy Period . . . arising out of any negligent act, error or omission in rendering or failing to render Professional Services . . . by [ChemTreat] or by any person . . . for whose negligent act, error or omission [ChemTreat] is legally responsible.

[Statement of Undisputed Material Facts ("SUMF") ¶ 50].   Underwriters do not dispute that, in this case, absent one of the three Policy exclusions, ChemTreat would be entitled to coverage for the Claim arising out of the *Windsor* Action.

First, Underwriters do not dispute that the *Windsor* complaint, filed October 10, 2017, constitutes a Claim under the Policy.   The Policy defines a "Claim" as "a demand . . . for money

or services, including the service of suit or institution of arbitration proceedings." [SUMF ¶¶ 51]. The *Windsor* complaint served on ChemTreat demands money [*see* Doc. 11 ¶ 45], and thus constitutes a Claim under the Policy.

Second, Underwriters do not dispute that Windsor first made the Claim against ChemTreat on October 12, 2017 – during the Policy period – when he served ChemTreat a copy of the complaint.  [SUMF ¶ 45].

Third, Underwriters do not dispute that ChemTreat timely notified Underwriters of the Claim.  Windsor commenced his suit on October 10, 2017; Marsh, on behalf of ChemTreat, notified Underwriters of the *Windsor* Action 7 days later, on October 17.  [SUMF ¶¶ 44-46]. Therefore, ChemTreat timely notified the Underwriters of the Claim.

Fourth, Underwriters do not dispute, in their Counterclaims or otherwise, that the alleged Claim arises out of allegations that ChemTreat acted negligently in rendering or failing to render Professional Services.

Underwriters contend only that three Policy exclusions justify their denial of ChemTreat's coverage.  [*See* Doc. 7 Counterclaims ¶ 5 (denying coverage "because three exclusions apply . . .")].  By not asserting in their Counterclaims that ChemTreat's claim fell outside of Insuring Agreement I.A.'s coverage, Underwriters waived any such argument.  *New York v. Amro Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir. 1991) ("New York law establishes that an insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense.").

Because the parties do not dispute the factual bases of the Claim, ChemTreat seeks a declaratory judgment from the Court holding that, unless Underwriters meet their burden of

establishing an applicable exclusion under the Policy (a burden which, as set forth in Sections C through F below, Underwriters cannot, as a matter of law, meet), Underwriters are obligated under the Policy's Insuring Agreement I.A. to pay on ChemTreat's behalf Damages and Claims Expenses, in excess of the Deductible, which ChemTreat incurred in the *Windsor* Action, up to the Policy limit.  ChemTreat also seeks a declaratory judgment from the Court holding that, with the exception of the three exclusions raised in their Counterclaims, Underwriters have waived the right to contest coverage under Insuring Agreement I.A.

**C.      The Three Policy Exclusions On Which Underwriters Rely Do Not Apply.**

Underwriters cite three Policy exclusions as grounds for denying ChemTreat's request for coverage (indemnity and defense) arising out of the *Windsor* Action:  The Retroactive Limitation Exclusion; the Excluding Matters Exclusion; and the Prior Knowledge, Prior Notice, and Prior Acts Exclusion.  [SUMF ¶ 53].  None of these exclusions apply here, because the Explosion and Post-Explosion Letters do not constitute "Claims" or "Circumstances" under the Policy, and because ChemTreat's personnel did not expect, and were not required by law or contract to expect, that the Explosion may be the basis of a Claim.

**1.      Neither the Explosion Nor the Post-Explosion Letters Constitute a "Claim" Under the Policy.**

The Policy defines a Claim as "a demand . . . for money or services, including the service of suit or institution of arbitration proceedings."  [SUMF ¶ 51].  The Explosion, in and of itself, cannot constitute a Claim under the Policy.  It is merely the factual predicate of a Claim, since a demand for money or services arising from the Explosion cannot be made until *after* the Explosion occurred.

The Post-Explosion Letters also do not constitute Claims, because none of those letters demand that ChemTreat provide money or services related to the Explosion.  [SUMF ¶¶ 23-24,

29-30, 37]. Indeed, Underwriters admit that none of the Post-Explosion Letters constitute a Claim. [SUMF ¶ 57].

Accordingly, ChemTreat requests that this Court hold that neither the Explosion nor the Post-Explosion Letters constitute a "Claim" under the Policy.

### 2. Neither the Explosion Nor the Post-Explosion Letters Constitute a "Circumstance" Under the Policy.

The Policy defines "Circumstance" as "any fact, event or situation that could reasonably be the basis for a Claim." [SUMF ¶ 58]. Applying the Policy's definition of Claim, the operable definition then becomes:

> Any fact, event or situation that could reasonably be the basis for a demand for money or services.[5]

Because, in this instance, Underwriters' rely on the definition of Circumstance to dictate the scope of certain exclusions, the Court must interpret the definition narrowly. *Pioneer Tower Owners Ass'n*, 12 N.Y.3d at 307.

Underwriters contend that the Explosion constitutes a Circumstance under the Policy. [Doc. 7 Counterclaims ¶ 60]. There is no dispute that the Explosion is a "fact, event or situation." But the fact that the Explosion occurred, in and of itself, is not legally sufficient to meet the definition of Circumstance. The definition of Circumstance is qualified, requiring not only that the fact, event or situation occur, but that it could also "reasonably be the basis" for a demand for money or services against ChemTreat. [*See* SUMF ¶ 58]. Under the undisputed material facts asserted in this case, no reasonable factfinder could conclude that the Explosion,

---

[5]     The Policy does not say from what vantage point one determines whether something "could reasonably be the basis for a Claim" so as to be a Circumstance. *Id.*

without any indicia that ChemTreat's services contributed to or caused the Explosion, is one ChemTreat could reasonably expect to be the basis for a demand for money or services against it.

As relevant here, ChemTreat provided water treatment chemical products and services at the Facility.  [SUMF ¶ 5].  ChemTreat did not maintain, operate, or repair Valley Proteins's equipment.  [*Id.* ¶ 6].  That activity was left to Valley Proteins and other entities.  When, on December 24, 2015, the Tank exploded, ChemTreat was not even at the Valley Proteins facility.  [*Id.* ¶ 11].

Not only did ChemTreat lack temporal and spatial proximity to the Tank at the time of the Explosion, but after the Explosion, the only entity with immediate, unimpeded access to the accident site, Valley Proteins, indicated to ChemTreat that it intended to continue using ChemTreat's services once the facility was repaired – strongly suggesting to ChemTreat that Valley Proteins did not view ChemTreat as a party potentially responsible for the Explosion.  [*Id.* ¶ 12].  In addition, after Valley Proteins completed a more thorough investigation of the Explosion's site, it concluded that the Tank exploded due to a manufacturing and design defect, and filed suit against Mid-South, the Tank's manufacturer and designer, shortly thereafter.  [*See id.* ¶ 14].  Indeed, even after commencing the Mid-South suit, and engaging in months of fact and expert discovery and filing multiple amended complaints, Valley Proteins never once alleged any act, error, omission, or other fact that would implicate ChemTreat in any manner of alleged wrongdoing, nor did it name ChemTreat as a defendant in its lawsuit against Mid-South for damages caused by the Explosion.  [*Id.* ¶¶ 25-26, 32, 34].

Under those circumstances, no reasonable factfinder could find – without the benefit of hindsight, upon which Underwriters so heavily rely – that the Explosion, in and of itself, could

reasonably be the basis for a demand for money or services against ChemTreat.  Thus, the Explosion is not a "Circumstance" under the Policy.

Underwriters also contend that ChemTreat's receipt of the Post-Explosion Letters gives rise to a Circumstance under the Policy.  [Doc. 7 Counterclaims ¶ 60].  However, the act of receiving the Post-Explosion Letters is not, in and of itself, a "fact, event or situation" that "could reasonably <u>be the basis</u> for a demand for money or services."  [SUMF ¶ 58 (emphasis added)].  Thus, ChemTreat's receipt of the Post-Explosions Letters, alone, does not constitute a Circumstance under the Policy.

While the Underwriters posit that the Post-Explosion Letters put ChemTreat on notice of a fact, event, or situation (*i.e.*, the Explosion) that, in Underwriters' view, could reasonably expect to be the basis for a demand for money or services, there is no evidence that ChemTreat had or reasonably should have had any such expectation based on the information – or, more accurately, the lack of information – in the Post-Explosion Letters.

In March 2016, ChemTreat received the first of the Post-Explosion Letters.  Insurance counsel for Mid-South, having been put on notice that Valley Proteins intended to file suit against it, began investigating the cause of the Explosion.  [SUMF ¶¶ 16, 19].  Before determining the Explosion's cause, or the entities or individuals potentially at fault, Mid-South's counsel sent form letters to 37 different entities, all of which Mid-South believed might have had some interaction with the Tank.  [*Id.* ¶ 17].  The letters contained statements typical of generic notice letters, stating things like, Mid-South's investigation is "ongoing" and claiming that Mid-South may have "potential claims" against the recipients, including for "indemnity and/or contribution", as well as requesting that the recipients preserve documents and put their insurance carries on notice.  [*Id.* ¶ 19].  The only customized sentence in each letter started with,

"It is our [Mid-South's] understanding that you may have . . . " and ended with a generalized description of the recipient's connection to the Tank.  [*Id.* ¶¶ 17, 22].  None of the letters stated that the recipients' connection to the Tank was something Mid-South believed to have caused or contributed to the Explosion, or which would lead to the recipient to reasonably conclude as much.  [*Id.* ¶ 18].  Indeed, as Mid-South's counsel would later confirm, when he sent the letters, the "cause of the explosion [was] unknown," and he was "simply putting manufactures/suppliers on notice" (even though ChemTreat was neither a manufacturer nor supplier of the Tank).  [*Id.* ¶ 20].

Mid-South's counsel sent the form letter to ChemTreat on March 15, 2017, solely based on Mid-South counsel's belief that ChemTreat "may have inspected, tested, and/or serviced the boiler system associated with the [Tank]."  [*Id.* ¶ 22 & Exh. F].  The March 15, 2017 letter did not state or even suggest that ChemTreat's services caused or contributed to the Explosion.  *See id.*  Nor did the letter assert any act, error, omission, or other specific facts that would implicate ChemTreat in any manner of alleged wrongdoing.  *See id.*

On May 5, 2017, nearly fourteen months after Mid-South sent its first letter to ChemTreat, Mid-South's counsel sent ChemTreat a "supplement to" the March 15, 2016 Letter.  [*Id.* ¶ 28].  The letter restates language in the March 15 letter and, importantly, attaches a copy of Valley Proteins's first amended complaint, which did not name or mention ChemTreat, or allege any act, error, omission, or other specific facts that would implicate ChemTreat in any manner of alleged wrongdoing.  [*Id.* ¶¶ 31-32].  The May 5 letter still did not assert a claim against ChemTreat or allege any act, error, omission, or other facts that would implicate ChemTreat in any manner.

17

On May 19, 2017, Valley Proteins again amended its complaint. [*Id.* ¶ 33]. Valley Proteins's second amended complaint, like the ones before it, did not name or mention ChemTreat, or allege any act, error, omission, or other specific facts that would implicate ChemTreat in any manner of alleged wrongdoing. [*Id.* ¶ 34].

On June 5, 2017 – more than seventeen months after the Tank exploded and months after Valley Proteins filed suit against Mid-South – counsel for Terry Windsor sent a letter to ChemTreat, which, like the letters from Mid-South, appeared to be a form document preservation letter.[6] [*Id.* ¶ 35]. The letter states that Windsor had retained counsel for personal injuries resulting from the Explosion and that Windsor's counsel believed that ChemTreat "provided services in connection with the [Tank] and other pressure vessels and equipment at the facility" and "also provided training to Valley Proteins employees in connection with such equipment." *Id.* The sole purpose of the letter was to "demand the preservation of certain evidence related to the [Tank]". [*Id.* ¶ 28].

The June 5, 2017 letter Windsor's counsel sent does not identify or even suggest that, based on ChemTreat's connection to the Tank, ChemTreat could potentially be responsible for, in full or in part, the Tank's explosion. [*Id.* ¶¶ 35-39]. Nor does the letter allege any act, error, omission, or other specific facts that would implicate ChemTreat in any manner of alleged wrongdoing. [*Id.* ¶ 39]. At best, the letter indicates that, based on ChemTreat's relationship to Valley Proteins's facility and employees, ChemTreat may have information Windsor could potentially use in a lawsuit against the entity or person he deemed responsible for the Explosion.

---

[6]     ChemTreat later subpoenaed Allen & Allen, Windsor's counsel, and confirmed that Allen & Allen sent a nearly identical letter to another entity, against which Windsor did not subsequently assert any claim of wrongdoing. [SUMF ¶ 39 n. 3].

In sum, the information conveyed in Post-Explosion Letters put ChemTreat in no better position to determine if and to what extent its services at the facility could possibly have contributed to the Explosion.  Not only that, Valley Proteins's ongoing litigation against Mid-South, in which Valley Proteins never pointed the finger at ChemTreat, solidified the reasonableness of ChemTreat's belief that, aside from having information potentially related to the Tank, ChemTreat had not committed any act, error, omission that would implicate ChemTreat in the Explosion.  [*See* SUMF ¶¶ 25-26, 32-34].  Under those facts, no reasonable factfinder could conclude that the Post-Explosion Letters contained information sufficient to put ChemTreat on notice of a fact, event or situation that could reasonably be the basis for a demand for money or services against it.  *See, e.g.*, *United Nat'l Ins. Co. v. Granoff, Walker & Forlenza, P.C.*, 598 F. Supp. 2d 540, 548 (S.D.N.Y. 2009) (in light of client's communicated desire to continue using insured's services, insured "surely had no reason to expect that [client] would later sue the [insured's] firm"); *Gen. Ins. Co. of Am. v. Rhoades*, 196 F.R.D. 620, 628 (D.N.M. 2000) (rejecting insurer's interpretation of policy that would "exclude coverage whenever an insured has been threatened with a claim, no matter how idly"; finding "[i]f the client has alleged no specifics, and the [insured] has no knowledge of any deficient performance of his or her duties, the [insured] would be justified in assuming the client's threats are mere mutterings not likely to come to fruition."); *Fremont Indem. Co. v. Lawton-Byrne-Bruner Ins. Agency Co.*, 701 S.W.2d 737, 742-43 (Mo. Ct. App. 1985) (finding "no substantial evidence to support a finding that [insured] possessed knowledge of any circumstances which might result in a claim", citing months-long delay between incident and client's correspondence and fact that insured "continued to be the [client's] broker" after incident).

To the extent Underwriters argue that the reasonableness requirement embedded in the definition of Circumstance must be interpreted from the Underwriters' subjective view, not ChemTreat's, Underwriters are mistaken.  The Policy does not expressly state from whose perspective this reasonableness requirement must be determined – whether from the insured's subjective view, the Underwriters' subjective view, or an objective view.  But, the definition's context makes clear that the Court must consider ChemTreat's subjective view to determine reasonableness.  In any event, even construing the definition in the light most favorable to Underwriters, the language is at best ambiguous.  Under New York law, the Court must resolve such ambiguities "in favor of the insured" and construe them "as narrowly as possible in an insurance exclusion".  *Morgan Stanley Grp., Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2nd Cir. 2000) (the rule of *contra proferentem* "generally provides that where an insurer drafts a policy 'any ambiguity in [the] . . . policy should be resolved in favor of the insured.'") (quoting *McCostis v. Home Ins. Co.*, 31 F.3d 110, 113 (2nd Cir. 1994)); *Gluck v. Executive Risk Indem., Inc.*, 680 F. Supp. 406, 419 (E.D.N.Y. 2010).  In this case, that means any ambiguity must be construed most favorably to ChemTreat (the insured), requiring an examination of ChemTreat's subjective view to determine whether the Explosion could reasonably be the basis for a demand for money or services.  To adopt a construction requiring reasonableness to be determined from the Underwriters' subjective perspective would impose an unworkable and unfair standard of performance on ChemTreat (and other insureds) of trying to gaze into a crystal ball and determine what an underwriter would make of the facts presented to the insured.

Considering the nature of ChemTreat's services at the Valley Proteins facility, the information available to ChemTreat when and after the Explosion occurred, the context leading up to the Post-Explosion Letters, and even the content of those letters, neither the Explosion nor

20

the Post-Explosion Letters can, as a matter of law, be construed as a "fact, event or situation that could reasonably be the basis for a demand for money or services" against ChemTreat. Accordingly, ChemTreat requests that the Court enter an order declaring that neither the Explosion nor the Post-Explosion Letters constitute a Circumstance under the Policy.

### D.     The Policy's Retroactive Limitation Exclusion Does Not Bar Coverage.

The Policy's Retroactive Limitation Clause provides, in relevant part, that Underwriters are not liable for a Claim "arising out of any circumstance or occurrence known to [ChemTreat] prior to [Policy] inception [on July 1, 2017] and not disclosed to Underwriters at inception [July 1, 2017]."  [SUMF ¶ 54).  Thus, to avail themselves of this exclusion, Underwriters must establish that: (1) the *Windsor* Action arose out of a circumstance or occurrence known to ChemTreat before July 1, 2017; and (2) ChemTreat did not disclose to Underwriters a known circumstance or occurrence[7] at the Policy's inception.

The term "circumstance" is defined by the Policy.  [SUMF ¶¶ 58].  As explained above [*see infra* pp. 14-21], when construed in accordance with New York law, Underwriters cannot identify a fact, event, or situation that qualifies as a Circumstance under the Policy.  As a result, Underwriters cannot establish that ChemTreat's Claim "arose out of" a Circumstance – because no such Circumstance exists.  The Court must therefore reject Underwriters' reliance on the Retroactive Limitation exclusion.

---

[7]     As an initial matter, the Policy does not define the term "occurrence".  When a policy does not define the term occurrence, it is, as a matter of law, ambiguous.  *World Trade Ctr. Props. LLC v. Travelers Indem. Co.*, 01 Civ. 12738 (JSM), 2002 U.S. Dist. LEXIS 9863, at *13 (S.D.N.Y. June 3, 2002) ("The history of litigation over the meaning of the term 'occurrence' amply demonstrates that its meaning is far from unambiguous and must be divined from the particular context in which it is used.").  Underwriters do not contend that the Explosion or Post-Explosion Letters constitute an occurrence, and thus ChemTreat does not further address the issue here.

Even if the Claim did arise out of a Circumstance, however, Underwriters must still establish that ChemTreat <u>knew</u> of the Circumstance prior to July 1, 2017, and failed to disclose that information to ChemTreat at the Policy's inception.  To establish ChemTreat's knowledge in this case, Underwriters rely exclusively on the Post-Explosion Letters.  [*See* Doc. 7 Counterclaims ¶¶ 59-60].  However, as set forth above [*see infra* pp. 16-21], no reasonable factfinder could conclude that the Post-Explosion Letters, taken in their proper context, put ChemTreat on notice of a fact, event or situation that could reasonably be the basis for a demand for money or services against ChemTreat.  Thus, at a minimum, Underwriters cannot establish that, prior to July 1, 2017, ChemTreat knew of a Circumstance, thereby precluding application of the Retroactive Limitation Exclusion.

Underwriters seek the broadest possible interpretation of the Retroactive Limitation Exclusion, essentially to permit them to exclude coverage based on the facts that the Explosion occurred and ChemTreat had provided services there, despite the absence of any indication that ChemTreat services caused or contributed to the Explosion.  [Doc. 7 Counterclaims ¶¶ 54-61]. Not only is Underwriters' interpretation not supported by the plain language of the exclusion, it is contradicted by the inclusion in its Application of a question directly bearing on the exclusion.

Question 5 of the Application, which is in the section titled "Claim and circumstances", states:

> After enquiry, is [ChemTreat] or any subsidiary or any person intended to be covered aware of any negligent act, error or omission or any other fact, complaint, circumstance or situation **which may be expected to give rise to a claim** against the Applicant or any subsidiary or any person intended to be covered.[8]

[SUMF ¶ 41 (emphasis added)].

---

[8]     The Policy incorporates the question and ChemTreat's response by reference.  [*See* Exh. B p. 8 of 55].

Underwriters' inclusion of Question 5 in the Application confirms what New York law already recognizes:  the insurance application's language colors the interpretation of related exclusionary provisions in the Policy.  *See Stratford Sch. Dist. v. Emp'rs Reins. Corp.*, 105 F.3d 45, 47 (1st Cir. 1997) (construing "the exclusion clause together with the application questionnaire").  In this instance, the Application asks ChemTreat whether it was aware of a Circumstance "which <u>may be expected</u> to give rise to a Claim".  [SUMF ¶ 41 (emphasis added)]. Assuming, solely for the sake of the argument, that Underwriters could establish that the Explosion or Post-Explosion Letters constitute a Circumstance (which they cannot), a proper construction of Question 5 – and, importantly, the construction of *any* exclusionary provision implicated by the language Underwriters chose to use in Question 5 – must be interpreted consistent with the question's use of the phrase "may be expected", which has been interpreted to mean "a likelihood", that facts which ChemTreat knew would give rise to a Claim.  *See, e.g.*, GARNER'S MODERN AM. USAGE at 529 (Brian A. Garner 3d ed. 2009) (noting that "may" and "might" "occupy different places on a continuum of possibility": "*May* expresses likelihood . . . , while *might* expresses a stronger sense of doubt") (emphasis in original); *Stratford Sch. Dist*, 105 F.3d at 47 (holding that language used in policy application "announced the standard for reporting" to be applied to policy exclusion).  There can be no doubt under the undisputed material facts in this case that Underwriters cannot meet that higher showing of "likelihood". Moreover, it would be unreasonable to allow Underwriters to, on the one hand, ask its applicants for specific information in an application for a policy, and then subsequently condone Underwriters' denial of coverage under the policy's exclusionary provisions based on the applicant's purported failure to provide more information than the Underwriters chose to ask for in that application.  *Stratford Sch. Dist*, 105 F.3d at 47 ("For the insurer to go the other way, and

say we do not cover matters of which [insured] had notice, even though that notice was too remote for [insured] to have to tell us about it, makes no sense; indeed, it would seem affirmatively misleading.").

Accordingly, ChemTreat seeks an order declaring that the Retroactive Limitation Exclusion does not bar coverage.  Alternatively, should the Court determine there are fact issues that would prevent it from deciding this issue on summary judgment, ChemTreat seeks a declaration that, in light of the verbiage Underwriters used in Question 5 of the Application, the Retroactive Limitation provision excludes only those Claims that arise out of any circumstance known to ChemTreat prior to Policy inception (on July 1, 2017) and not disclosed to Underwriters at inception (July 1, 2017), and that ChemTreat, in its subjective view, reasonably expected were likely to give rise to a Claim.

**E.      The Policy's Excluding Matters Exclusion Does Not Bar Coverage.**

The Excluding Matters Exclusion bars coverage for "any claim, loss, liability or expense arising out of any claim or Circumstance . . . known to the Insured prior to the inception of this policy Period or which in the reasonable opinion of the Insurers ought to have been known". [SUMF ¶ 56].  Because Underwriters admit that neither the Explosion nor the Post-Explosion letters constitute a "Claim", for Underwriters to invoke this exclusion, they must establish the existence of a Circumstance that either (1) was known to ChemTreat; or (2) Underwriters reasonably believed is one of which ChemTreat ought to have known.

As set forth above, Underwriters cannot establish the existence of a Circumstance in this case.  [*See infra* pp 14-21].  And even if they could, Underwriters cannot demonstrate, as a matter of law, that ChemTreat knew of a Circumstance prior to the Policy's inception.  [*See id.* pp. 16-21].

The second prong – whether the Underwriters reasonably believed ChemTreat ought to have known of a Circumstance prior to the Policy's inception – turns on the insurer's reasonable belief, which can, in appropriate cases, be resolved on summary judgment. *See United States Liab. Ins. Co. v. Dehkterman*, 2002 U.S. Dist. LEXIS 22926, at *3 (E.D.N.Y. Oct. 4, 2002) ("Ordinarily, the issue of reasonableness is a question of fact for the trier of fact, but in appropriate cases it may be decided as matter of law."); *Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 444 (S.D.N.Y. 2013) (objective reasonableness "is a mixed question of law and fact, meaning that it should be decided by the Court only if there is no genuine issue of material fact as to the belief's reasonableness") (internal quotations and citations omitted).  In this case, where the material facts are undisputed (or cannot reasonably be disputed with competent evidence) and establish that no reasonable insurer could have such a belief, summary judgment is appropriate.

The holding in *Hartford Steam Boiler Grp. v. SVB Underwriting, Ltd.*, No. 3:04cv2127 (SRU), 2011 U.S. Dist. LEXIS 53743 (D. Conn. May 19, 2011) ("*HSB Group*"), is instructive, as it addresses the application of certain exclusions under facts substantially similar to those at issue here.  In *HSB Group*, the court concluded:

> The benefit of hindsight makes it easy to speculate that, because [the insured] eventually was sued by several different plaintiffs, [the insured] should have anticipated the litigation against it. Yet there is a difference between expecting litigation – believing that it is likely [to] occur – and knowing that litigation is within the realm of possibility. Although perhaps [the insured] should have known litigation was possible, [the insurer] has not demonstrated that [the insured] reasonably should have expected it as of December 1, 2000.

*Id.* at *35-36.

The holding in *HSB Group* rings particularly true today – litigation is *always* "within the realm of possibility".  But under the Excluding Matters Exclusion (as well as under the other

exclusions on which Underwriters rely), Underwriters must establish much more than merely the possibility of litigation and, in attempting to do so, are not entitled to the benefit of hindsight. Under the undisputed material facts at issue here, Underwriters cannot meet that burden.

Accordingly, ChemTreat seeks a declaration from this Court holding that the Excluding Matters Exclusion does not bar coverage.

**F.      The Policy's Prior Knowledge, Prior Notice, and Prior Acts Exclusion Does Not Bar Coverage.**

The exclusion for "Prior Knowledge, Prior Notice and Prior Acts", provides, in pertinent part, that there is no coverage for any Claim:

1.      arising out of or resulting from any act, error or omission . . . committed or arising prior to the inception date of this Insurance:

(a)      if any director, officer, principal, partner, insurance manager or any member of the risk management or legal department of the Assured Organization on or before the inception date knew or could have reasonably foreseen that such act, error or omission . . . might be expected to be the basis of a Claim.

[SUMF ¶ 55].

New York courts have applied a two-pronged standard to determine the applicability of known claims exclusions, and direct that the insurer bears the burden of proof on both prongs. *See Exec. Risk Indem. Inc. v. Pepper Hamilton LLP*, 865 N.Y.S.2d 25, 29 (App. Div. 2008); *Quanta Lines Ins. Co. v. Inv'rs Capital Corp.*, 2009 U.S. Dist. LEXIS 117689, at *45 (S.D.N.Y. Dec. 17, 2009).  Under this standard, "a Court first asks the subjective question of whether the insured had knowledge of relevant facts and, second the objective question of whether a reasonable person in the insured's position would foresee that those facts might be the basis of a Claim." *Quanta Lines Ins. Co.*, 2009 U.S. Dist. LEXIS at *47-48. *See also Liberty Ins. Underwriters, Inc. v. Corpina Piergrossi Overzat & Klar LLP*, 913 N.Y.S.2d 31, 33 (App. Div. 2010) (internal quotation marks and citations omitted); *Commercial Underwriters Ins. Co. v.*

*Hunt & Calderone, P.C.,* 261 Va. 38, 540 S.E.2d 491, 493-94 (2001) (applying an objective standard to evaluate an insured's prior knowledge in a professional liability insurance case).

Importantly, in applying the objective standard of what a reasonable insured would have foreseen, the governing New York law provides:

> [A]n insurance carrier seeking to disclaim coverage based on a prior knowledge exclusion bears a heavy burden to establish that the insured had knowledge of a "clear breach of duty". In this sense, **mere knowledge of "some consequences" of an act is inconsequential, which, standing alone, would not provide a reasonable basis from the insured to believe that it had committed a wrongful act that foreseeably will result in a claim.**

*J.P. Morgan Sec. v. Vigilant Ins. Co.*, 51 N.Y.S.3d 369, 383 (Apr. 17, 2017), *amended on other grounds*, 2017 N.Y. Misc. LEXIS 3051 (N.Y. Sup. Ct. Aug. 7, 2017) (internal citations omitted) (emphasis added).

Here, applying the governing standard, the facts are simply too remote to support the application of the Prior Knowledge, Prior Notice and Prior Acts exclusion. There are no grounds for finding that the Explosion or any of the Post-Explosion Letters provided a reasonable basis for ChemTreat to believe it had committed a wrongful act, nor grounds for finding that a reasonable insured could foreseeably expect a claim to result from the Explosion or Post-Explosion Letters. [*See infra* pp. 14-21]. Thus, ChemTreat is entitled to a declaration holding that the Prior Knowledge, Prior Notice, and Prior Acts exclusion does not bar coverage in this case.

Alternatively, should the Court find there are fact issues precluding a decision on summary judgment, ChemTreat, for the same reasons set forth in Section D above, seeks an order from the Court holding that this exclusion must be interpreted in conjunction with Question 5 of the Application, which requires only that ChemTreat provide notice of alleged facts, errors or omissions "which <u>may be expected</u> to give rise to a Claim".

**G.      Underwriters Owed a Duty to Defend on Receipt of ChemTreat's Notice.**

An insurance company's duty to defend is "distinct from" its duty to indemnify.  *Cowan v. Ernest Codelia, P.C.*, 98 Civ. 5548 (JGK), 1999 U.S. Dist. LEXIS 17606, at *12 (S.D.N.Y. Nov. 5, 1999).  The duty to defend is broader.  *Nationwide Insulation & Sales, Inc. v. Nova Cas. Co.*, 905 N.Y.S.2d 234, 235 (App. Div. 2010); *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006).  "'An insurer must defend whenever the four corners of the complaint suggest—or the insurer has actual knowledge of facts establishing—a reasonable possibility of coverage.'" *Int'l Bus. Machs. Corp. v. Liberty Mut. Fire Ins. Co.*, 303 F.3d 419, 424 (2d Cir. 2002) (quoting *Cont'l Cas. Co. v. Rapid-Am. Corp.*, 609 N.E.2d 506, 509 (N.Y. 1993)).  "[S]o long as the claims asserted against the insured may rationally be said to fall within policy coverage, *whatever may later prove to be the limits of the insurer's responsibility to pay,* there is no doubt that it is obligated to defend."  *Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 620 (2d Cir. 2001) (*quoting Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 310-11 (1984)) (internal bracketing and quotation marks omitted) (emphasis in original).

This "'separate, contractual duty to defend' exists 'until it is determined *with certainty* that the policy does not provide coverage.'"  *Id.* (*quoting Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d at 310-11) (emphasis in original).  To be relieved of its duty to defend on the basis of a policy exclusion, the insurer bears the burden of demonstrating that:  (1) the allegations of the complaint in the underlying claim lie wholly within that exclusion; and (2) that is the only way to interpret the exclusion, making it impossible to argue there is any basis upon which the insurer might eventually be obligated to indemnify its insured.  *K2 Investment Grp., LLC v. American Guar. & Liability Ins.*, 936 N.Y.S.2d 139, 141 (N.Y. App. Div. 2012) (insurer bears the burden of demonstrating "there is no possible factual or legal basis upon which the insurer might be eventually obligated to indemnify its insured"); *Johnstown v. Bankers Standard Ins. Co.*, 877

F.2d 1146, 1149 (2d Cir. 1989) ("New York courts have consistently held that, as noted, an insurer seeking to avoid its duty to defend bears a heavy burden.").

Here, Underwriters admit that, at the time they received the Notice, they had no knowledge of the Post-Explosion Letters, or their contents.  [SUMF ¶ 47].  And there is no dispute that, from the four corners of the *Windsor* complaint, ChemTreat was entitled to coverage under the Policy.  Accordingly, at that time, Underwriters had no basis on which to decline to provide ChemTreat with the defense it paid for and is entitled to under the Policy.  And, in any event, Underwriters cannot use facts beyond the complaint to disclaim the duty to defend.  *Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61, 65-66 (1991).

The insurance company's remedy, to avoid being charged for defense costs it does not believe it is required to pay, is to promptly file a declaratory judgment action.  An "insurance company can readily protect itself, from having to defend for too long," by "seek[ing] a declaratory judgment with respect to the relevant policy exclusion."  *Hugo Boss Fashions*, 252 F.3d at 622; *see also Lang v. Hanover Ins. Co.*, 3 N.Y.3d 350, 356 (2004) ("an insurance company that disclaims . . . where coverage may be arguable is well advised to seek a declaratory judgment concerning the duty to defend or indemnify").  There is no dispute that Underwriters failed to promptly seek such declaratory judgment here.  [SUMF ¶ 49].

For these reasons, ChemTreat seeks an order declaring that Underwriters breached their duty to defend ChemTreat in the *Windsor* Action and that, by failing to promptly seek declaratory judgment regarding the application of certain Policy exclusions, Underwriters improperly withheld from ChemTreat a defense of the *Windsor* Action.

**Conclusion**

For the foregoing reasons, ChemTreat respectfully requests that the Court enter summary

judgment in its favor and against Underwriters on all claims and issues raised in this motion.

DATED:  September 23, 2019          */s/ Constantinos G. Panagopoulos*

Constantinos Panagopoulos
BALLARD SPAHR  LLP
1909 K Street, NW – 12th Floor
Washington, DC  20006-1157
Telephone:  202-661-2200
Facsimile:  202- 661-2299
cgp@ballardspahr.com

and

Andrew J. Petrie
BALLARD SPAHR LLP
1225 Seventeenth Street – Suite 2300
Denver, Colorado  80202-5596
Telephone:  303-292-2400
Facsimile:  303-296-3956
petriea@ballardspahr.com

*Attorneys for Plaintiff ChemTreat, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 23rd day of September 2019, I have filed electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including:

> Leland H. Jones IV
> WILEY REIN LLP
> 1776 K Street N.W.
> Washington, D.C.  20006
>
> *Counsel for Defendant*

> */s/ Constantinos G. Panagopoulos*
> Constantinos Panagopoulos
> BALLARD SPAHR LLP
> 1909 K Street, NW – 12th Floor
> Washington, DC  20006-1157
> Telephone:  202-661-2200
> Facsimile:  202- 661-2299
> cgp@ballardspahr.com