### THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

**CHEMTREAT, INC,**

       **Plaintiff/Counter-Defendant,**

**v.**                                                    **Civil Action No. 3:19cv63**

**CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON SUBSCRIBING
TO POLICY NO. B0509FINPS1700245,**

       **Defendant/Counter-Claimant.**

### MEMORANDUM OPINION

This matter comes before the Court on two motions:

(1)      Defendant/Counter-Claimant Certain Underwriters at Lloyd's of London Subscribing to Policy No. B0509FINPS1700245's ("Underwriters") Motion for Summary Judgment (the "Underwriters Motion for Summary Judgment"), (ECF No. 32); and,

(2)      Plaintiff/Counter-Defendant ChemTreat, Inc.'s ("ChemTreat") Motion for Summary Judgment (the "ChemTreat Motion for Summary Judgment"), (ECF No. 34).

Underwriters and ChemTreat filed Cross-Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.[1] Underwriters and ChemTreat each responded to the Cross-Motions. (ECF Nos. 37, 38.) These matters are ripe for disposition.

---

[1] Federal Rule of Civil Procedure 56(a) provides, in pertinent part:

(a) **Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).[2] For the reasons stated below, the Court will grant the Underwriters Motion for Summary Judgment and deny the ChemTreat Motion for Summary Judgment.

## I.  Procedural and Factual Background

This insurance action arises out of Underwriters' refusal to defend and indemnify ChemTreat under an insurance policy (the "Policy") in a suit brought against ChemTreat after a vessel in a boiler system exploded at the Valley Proteins, Inc. ("Valley Proteins") plant in Accomac, Virginia.

### A.      Factual Background[3]

#### 1.      Boiler Explosion at the Valley Proteins Plant

On December 24, 2015, approximately one and a half years before the Policy period began, a pressure vessel—the High Pressure Condensate Receiver ("HPCR")—in a boiler system failed at the Valley Proteins plant causing an explosion (the "Explosion"). (Mem. Supp. ChemTreat Mot. Summ. J. Ex. A-3 "Windsor Complaint" ¶¶ 34–38, ECF No. 35-1.) The

---

[2] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2). ChemTreat is a citizen of Virginia, Underwriters consist of a number of insurance syndicates who are citizens of the United Kingdom, and the Complaint alleges damages exceeding $75,000. (Compl. ¶¶ 2–7, ECF No. 1; Underwriters Answer & Countercl. 2–3, ECF No. 7.)

[3] In recounting the factual history, the Court relates the undisputed facts as articulated in the parties' briefing on both motions for summary judgment. In ruling on each motion, the Court will view the undisputed facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Explosion injured Terry Windsor, a Valley Proteins employee working in the boiler room.  (*Id.*)
At the time, ChemTreat "provided industrial water treatment services to Valley Proteins for its
boiler system, including on-site services such as water quality testing of the HPCR" to prevent
corrosion of the boiler.  (ChemTreat Answer Countercl. ¶ 26, ECF No. 11; Windsor Compl.
¶¶ 181–84.)  ChemTreat did not design, manufacture, or supply the boiler system or tank.  (Mem.
Supp. ChemTreat Mot. Summ. J. Ex. A. "Affidavit of Jose Luis Borrero" ¶ 10, ECF No. 35-1.)
"ChemTreat's services did not encompass any operation, maintenance or repair of Valley
Proteins's equipment."  (*Id.* ¶ 8.)  Mid-South Steam Boiler and Engineering Co., Inc. ("Mid-
South"), a different entity, designed and manufactured the tank.  (ChemTreat Answer Countercl.
¶ 29.)  At the time of the Explosion, no ChemTreat personnel were present at the Valley Proteins
facility.  (Borrero Aff. ¶ 11.)

On December 29, 2015, five days after the Explosion, Adam Hildebrant, a ChemTreat
employee responsible for the Valley Proteins account informed ChemTreat's billing department
in an email that Valley Proteins "had an issue that has caused an emergency shutdown of their
facility."  (Mem. Supp. ChemTreat Mot. Summ. J. Ex. A-1 "Hildebrant Email" 1, ECF No. 35-
1.[4])  Hildebrant informed ChemTreat's billing department that Valley Proteins expected "to
resume operations in March 2016" and asked if ChemTreat could suspend billing on the Valley
Proteins account.  (*Id.*)

### 2.    Pre-Suit Correspondence from Potential Plaintiffs

Following the Explosion, ChemTreat received three letters from counsel for parties
involved with the Explosion:  two from Mid-South and one from Windsor.

---

[4] The indicated page number of each exhibit references the page number as assigned by
the Court's CM/ECF System.

**a.**     <u>The March 15, 2016 Letter From Mid-South to ChemTreat</u>

On March 15, 2016, Counsel for Mid-South sent a letter to ChemTreat (the "March 15, 2016 Letter").[5] (Mem. Supp. ChemTreat Mot. Summ. J. Ex. E "Declaration of Brian W. Lown" 112–13, ECF No. 35-5.) Mid-South manufactured the boiler that exploded. (*Id.* 112.) In contrast to Valley Proteins, Mid-South was not ChemTreat's customer. The March 15, 2016 Letter stated that "[o]n December 24, 2015, an explosion occurred at a Valley Proteins facility . . . causing extensive damage." (*Id.*) Counsel for Mid-South stated that Mid-South had been "placed on notice of potential subrogation claims by various insurance carriers for Valley Proteins, alleging that a pressure vessel manufactured by Mid-South was involved in the explosion." (*Id.*)

The March 15, 2016 Letter claims that ChemTreat "inspected, tested and/or serviced the boiler system associated with the [HPCR]," and *"[a]ccordingly, we are writing to place you on notice of potential claims **Mid-South** may have against you [ChemTreat], including, but not limited to, claims for indemnity and/or contribution."* (*Id.* (emphases added).) Additionally, the March 15, 2016 Letter requested that ChemTreat "forward this letter to [its] insurance carriers and place them on notice of these potential claims" and "preserve all evidence and potentially relevant or discoverable documents, items, or information[.]" (*Id.* 113.)

---

[5] ChemTreat learned in 2019 that between January 29 and April 28, 2016 Mid-South's counsel sent 37 different entities similar letters due to those entities' involvement with the purchase, design, manufacture, assembly, inspection, service, or repair of the boiler system. (*See* Mem. Supp. ChemTreat Mot. Summ. J. Ex. D "Declaration of Patrick D. Blake Esq.," ECF No. 35-4; Mem. Supp. ChemTreat Mot. Summ. J. Ex. E "Declaration of Brian W. Lown Esq.," ECF No. 35-5.) ChemTreat includes copies of those letters as exhibits to its Memorandum in Support. (*See id.*) (Blake Decl. 2, 5; Lown Decl. 2, 7.)

### b.     <u>The May 5, 2017 Letter From Mid-South to ChemTreat</u>

On May 5, 2017, roughly fourteen months after its first letter, Mid-South sent a second letter to ChemTreat (the "May 5, 2017 Letter"). (Mem. Supp. ChemTreat Mot. Summ. J. Ex. G "May 5, 2017 Letter," ECF No. 35-7.)

Counsel for Mid-South stated that it was sending the May 5, 2017 Letter to ChemTreat "as a supplement to our prior notice of potential claims Mid-South may have against you." (*Id.*) The May 5, 2017 Letter informed ChemTreat that Valley Proteins had filed suit against Mid-South with respect to the Explosion, and stated that *Mid-South* "may have claims against you with respect to the matters raised in the lawsuit, including for indemnity and/or contribution." (*Id.*)

The May 5, 2017 Letter also included a copy of the complaint filed by Valley Proteins against Mid-South in the Norfolk Division of the United States District Court for the Eastern District of Virginia (the "Valley Proteins Complaint").[6] In its complaint, Valley Proteins alleges Mid-South's "defective, deficient, improper and inadequate treatment of the pressure vessel tank during fabrication and manufacturing in order to relieve stress prior to the sale, supply, distribution, and installation of the pressure vessel tank" caused the Explosion. (*Id.* 8.) The Valley Proteins Complaint did not name or otherwise mention ChemTreat in relation to the Explosion. (Borrero Aff. ¶ 23.)

In the May 5, 2017 Letter, Mid-South reiterated its earlier request that ChemTreat "forward this letter to your insurance carrier(s), and continue to preserve all evidence and potentially relevant or discoverable documents, items, or information, as set forth in our previous

---

[6] *Valley Proteins, Inc. v. Mid-South Steam Boiler and Engineering Co., Inc.*, No. 2:17cv19 (E.D. Va.).

correspondence." (May 5, 2017 Letter 1.)  The May 5, 2017 Letter also states that "if you are represented by counsel in this matter, please ask them to contact us, so that we will know to communicate directly with them." (*Id.*)

Finally, in the May 5, 2017 Letter, Counsel for Mid-South informed ChemTreat that Valley Proteins intended to "cut pieces of the pressure vessel head and tank into smaller pieces for transport to a different facility for storage and to reduce storage costs." (*Id.*)  In addition to the Valley Proteins Complaint, Counsel for Mid-South enclosed correspondence between Mid-South and Counsel for Valley Proteins showing that Mid-South objected to Valley Proteins's plan to cut the pressure vessel, as "[s]uch actions could spoilate evidence." (*Id.* 26.)  Mid-South further objected that at that time "we do not even know the full details of [Valley Protein's] liability theories or the opinions of experts in the pending lawsuit." (*Id.*)  The letter from Mid-South to Valley Proteins also stated that "we understand that the Valley Proteins employee injured in the subject incident intends to file a lawsuit, but has not yet done so." (*Id.*)

### c.   **The June 5, 2017 Letter from Terry Windsor to ChemTreat**

Third, on June 5, 2017, one month after Mid-South's second letter to ChemTreat, Counsel for Terry Windsor, the individual injured in the explosion, wrote to ChemTreat (the "June 5, 2017 Letter").[7]  (Mem. Supp. ChemTreat Mot. Summ. J. Ex. H. "June 5, 2017 Letter," ECF No. 35-8.)  Windsor delivered this letter via service of process. (*Id.*)  In the June 5, 2017

---

[7] In 2019, ChemTreat learned that on June 5 and July 19, 2017, Counsel for Windsor sent similar letters to Tate Engineering, Inc. ("Tate"), which Counsel for Windsor believed had "provided maintenance services in connection with" the HPCR. (Mem. Supp. ChemTreat Mot. Summ. J. Ex. J-1 "Declaration of Ashley T. Davis Esq." 6, ECF No. 35-10.)  ChemTreat includes copies of the letters sent from Counsel for Windsor to Tate as exhibits to its Memorandum in Support. (*See id.* 6–16.)  The Davis Declaration reports that ChemTreat served her firm with a subpoena for these documents in relation to the present action on August 2, 2019, and that Mrs. Davis executed the affidavit on September 23, 2019. (*Id.* 2.)

6

Letter, Counsel for Windsor informs ChemTreat that her "law firm represents Terry Windsor for personal injuries resulting from an explosion at the Valley Proteins facility . . . on December 24, 2015." (*Id.* 4.)

The June 5, 2017 Letter stated that it was Counsel for Windsor's "understanding that ChemTreat . . . provided services in connection with the [HPCR] and other pressure vessels and equipment at the facility, and that ChemTreat . . . also provided training to Valley Proteins employees in connection with such equipment." (*Id.*) The June 5, 2017 Letter "formally demand[ed] the preservation of certain evidence relat[ing] to the [HPCR], the Valley Proteins facility[,] . . . and the [Explosion]." (*Id.*) In the June 5, 2017 Letter, Counsel for Windsor identified fifteen categories of documents and evidence to be preserved and warned that if ChemTreat failed to "properly secure and preserve these important pieces of evidence, we reserve the right to claim that you have destroyed and/or spoilated the evidence in a manner that is harmful to our client's claim." (*Id.* 4–6.)

These documents included:

> 3. Any test reports or results, inspection reports, sampling records, or similar documentation concerning the **testing, inspection, and sampling** of the HPCR. - This request specifically includes **all Boiler Service Reports** or similar documents relating to the HPCR (we have enclosed an example with this letter).[8] . . . [and] all *internal* correspondence, documents and electronic communications about the HPCR at ChemTreat, Inc.
>
> 4. All **guidance documents**, worksheets, manuals, **industry standards**, textbooks, protocols, checklists or similar materials that you (and your agents and employees) used, consulted, referred to, or relied upon in connection with the HPCR at the Valley Proteins facility . . . .

---

[8] As an exhibit to the Windsor Letter, Counsel for Windsor provided a boiler services report for the Valley Proteins plant prepared by Adam Hildebrandt, a ChemTreat employee, on January 8, 2014. (June 5, 2017 Letter 8–9.)

> 5. All correspondence, documents and electronic communications concerning **training** that you provided to employees at the Valley Proteins, Inc. facility . . . before December 25, 2015 . . . specifically includ[ing] training materials and handouts, training manuals, class rosters, and sign-in/attendance sheets.

(*Id.* 7 (emphases in original).)

### 3. ChemTreat Litigation Holds

On April 13, 2016 and June 14, 2017, the General Counsel for ChemTreat issued internal letters to ChemTreat employees, both entitled "Retention and Preservation of Evidence Regarding Valley Protein-Accomac" (the "Litigation Holds"). (Mem. Supp. Underwriters Mot. Summ. J. Exs. B–C "Litigation Hold Letters" 2, ECF Nos. 33–3, 33–4.) ChemTreat's General Counsel issued the first litigation hold twenty-eight days after receipt of the March 15, 2016 Letter from Counsel for Mid-South, and the second litigation hold eight days after receipt of the June 5, 2017 Letter from Counsel for Windsor. (*Id.*)

In the Litigation Holds, ChemTreat's General Counsel reports that "in late December 2015, there was an incident at the Valley Protein . . . manufacturing facility." (*Id.*) "Specifically, there was an explosion involving the boiler at the . . . [f]acility." (*Id.*) The Litigation Holds each state that, while "ChemTreat does not believe [it is] responsible for the accident," "the boiler manufacturer has sent what appears to be a routine insurance notification and evidence preservation letter to [ChemTreat]. Accordingly, [ChemTreat is] issuing this notice to retain and preserve evidence out of an abundance of caution." (*Id.*) The Litigation Holds provide that ChemTreat "believe[s] this approach is prudent" because "[i]n the event of litigation related to the incident[,] . . . we do not want a plaintiff to be able to prop up unsupported claims by manufacturing side-issues about destruction of evidence." (*Id.*)

8

### 4.    The Underwriters' Policy

Underwriters issued A&E MediaTech Policy No. B0509FINPS1700245 to ChemTreat for the policy period of July 1, 2017 to July 1, 2018 (the "Policy"). (*See* Compl. Ex. A "Policy," ECF No. 1-2.) The Policy provides that "[a]ny disputes involving this Policy shall be resolved applying the law designated in Item 12 of the Declarations" which in turn specifies that "New York law" should apply to any dispute. (*Id.* 8, 37.) The Policy's "Choice of Law" provision further provides that "any dispute concerning the interpretation of this Policy shall be governed by the laws of New York." (*Id.* 39.)

> Under the "Claims-Made" Policy, Underwriters agree to pay
>
> Damages and Claims Expenses, in excess of the Deductible, which the Assured shall become legally obligated to pay because of any Claim first made against the Assured during the Policy Period . . . and reported to Underwriters . . . during the Policy Period . . . arising out of any negligent act, error or omission in rendering or failure to render Professional Services . . . by the Assured or by any person, including an independent contractor, for whose negligent act, error or omission [ChemTreat] is legally responsible.

(*Id.* 6, 9.) The Policy defines "Claim" to mean "a demand received by [ChemTreat] for money or services including the service of suit or institution of arbitration proceedings." (*Id.* 25.) The Policy also includes three exclusions for any claims arising out of events occurring before the Policy's inception date, as set forth below:  (1) the Retroactive Limitation Clause; (2) the Excluding Matters Exclusion; and, (3) the Prior Knowledge Exclusion.

### a.    The Retroactive Limitation Clause

First, the Policy's Retroactive Limitation Clause states, in pertinent part:  "[t]here shall be no liability hereunder in respect of any claim: . . . (b) arising out of any *circumstance* or *occurrence* known to the Assured prior to the inception hereof [July 1, 2017] and not disclosed to Underwriters at inception [July 1, 2017]." (Policy 39 (emphases added).)

The Policy defines a circumstance as "any fact, event or situation that could reasonably be the basis for a Claim." (*Id.* 25.) The Policy does not define "occurrence." As part of the application process for the Policy, ChemTreat submitted to Underwriters a Miscellaneous Professional Indemnity Proposal Form which was signed on June 13, 2017. (Mem. Supp. ChemTreat Mot. Summ. J. Ex. I "ChemTreat Application" 7, ECF No. 35-9.)

As part of the application, Underwriters inquired as to ChemTreat's knowledge of certain facts which might give rise to a claim against it. ChemTreat answered "No" to the following question: "[a]fter enquiry, is the Applicant or any subsidiary or any person intended to be covered aware of any negligent act, error or omission or any other fact, complaint, circumstance or situation which may be expected to give rise to a claim against the Applicant or any subsidiary or any person intended to be covered?" (*Id.* 7.)

### b.  The Excluding Matters Exclusion

Second, the  Excluding Matters Exclusion states, in relevant part, that

> [t]his Policy shall not indemnify the Insured in respect of any claim, loss, liability or expense arising out of any claim or Circumstance (a) known to the Insured prior to the inception of this Policy [July 1, 2017] or which in the reasonable opinion of the Insurers ought to have been known . . . .

(Policy 44.)

### c.  The Prior Knowledge Exclusion

Finally, the Prior Knowledge Exclusion, states that the Policy will "not apply to Damages or Claims Expenses in connection with or resulting from any Claim:"

> arising out of or resulting from any act, error or omission or Pollution Condition committed or arising prior to the inception date of this Insurance: (a) if any director, officer, principal, partner, insurance manager or any member of the risk management or legal department of the Assured Organization on or before the inception date [July 1, 2017] knew or could have reasonably foreseen that such act, error or omission . . . might be expected to be the basis of a Claim . . . .

(Policy 16–17.)

### 5.    The Windsor Action and ChemTreat's Request for Coverage

On October 12, 2017, Windsor filed suit in the in the Circuit Court for the County of

Henrico against ChemTreat, Adam Hildebrant, a ChemTreat employee, Mid-South, and ten other

entities. (Windsor Compl. 17–19.)  In the Windsor Complaint, Windsor states that ChemTreat

"contracted . . . to provide water treatment and chemical products, services and support to certain

equipment at [Valley Proteins], including the HPCR." (*Id.* ¶ 181.)  According to Windsor,

"ChemTreat had a duty to test the water quality of the HPCR and to determine if the water

quality was within acceptable limits so as to prevent corrosion within the HPCR." (*Id.* ¶ 182.)

Neither ChemTreat, nor its employee Hildebrant, however, warned Valley Proteins that "the

water quality of the HPCR was not within acceptable limits." (*Id.* ¶ 282.)  Windsor claims

ChemTreat and Hildebrandt's failure to warn Valley Protein of water quality problems allowed

the boiler to corrode, thus proximately causing his injuries. (*Id.* ¶¶ 283–86.)

The Windsor Complaint seeks $25 million jointly and severally from all defendants. (*See*

*id.* 54.)  At this time, "ChemTreat and . . . Hildebrant have fully resolved the claims asserted

against them in the Windsor Action by settlement." (Mem. Supp. Underwriters Mot. Summ. J.

Ex. 1 "Declaration of Leland H. Jones IV" ¶ 7, ECF No. 33-1.)

On October 17, 2017, five days after Windsor filed the Windsor Complaint, ChemTreat,

through an intermediary, notified Underwriters of the Windsor Action. (Borrero Aff. ¶ 29.)  On

November 16, 2017, General Counsel for ChemTreat forwarded to Underwriters copies of the

pre-suit correspondence, which served as the basis for Underwriters' coverage denial.

(Underwriters Answer & Countercl. Ex. 7 "December 15, 2017 Denial Letter" 1, ECF No. 7-7;

Resp. ChemTreat Mot. Summ. J. Ex. 1 "Affidavit of Kyle Young," ECF No. 38-1.)  Over two

years later, on December 15, 2017, Underwriters sent a letter to ChemTreat denying any

11

coverage for the Windsor Action. (December 15, 2017 Denial Letter.) In explaining their rationale for denying coverage, Underwriters stated that

> [t]he letters of March 15, 2016, May 5, 2017, and June 5, 2017 . . . gave ChemTreat notice of the explosion at the Plant, the resulting injuries and property damage, and ChemTreat's potential liability as a result of the services it provided at the Plant— i.e., the same basis for liability as alleged in Mr. Windsor's complaint. Given the facts recited and requests made in the letters, ChemTreat had reason to anticipate a Claim.

(*Id.* 6.) Because in Underwriters' view ChemTreat had notice of a fact or event that could give rise to a potential claim against it at the time ChemTreat entered into the Policy on July 1, 2017, Underwriters denied coverage under the Excluding Matters Exception, the Retroactive Limitation Clause, and the Prior Knowledge Exception. (*See id.*)

## B.   Procedural History

On January 28, 2019, ChemTreat filed its Complaint bringing two counts against Underwriters, alleging Underwriters: (1) breached their duty to defend and indemnify ChemTreat under the Policy; and, (2) breached their duty to act reasonably and in good faith in providing coverage. (*See* Compl., ECF No. 1.) Underwriters timely answered and asserted a counterclaim, seeking a "judicial declaration that they have no duty to defend or indemnify ChemTreat" for the Windsor Action. (Underwriters Answer & Countercl. 26.) Specifically, Underwriters seek a declaratory judgment that the Excluding Matters Exception, the Retroactive Limitation Clause, and the Prior Knowledge Exception bar "any coverage whatsoever for the Windsor Action, and therefore Underwriters have no duty to defend or indemnify ChemTreat or any other party." (*Id.* 38.) The Parties filed their Cross-Motions for Summary Judgment, and both Parties responded.

For the reasons stated below, the Court will grant the Underwriters Motion for Summary Judgment and deny the ChemTreat Motion for Summary Judgment. In reaching this conclusion,

12

the Court first concludes that Underwriters did not have a duty to indemnify ChemTreat for the

Windsor Action under the plain language of the Policy exclusions. The Court next determines

that Underwriters did not have a duty to defend ChemTreat because it disclaimed coverage in a

reasonable time period. Finally, the Court addresses ChemTreat's claim in Count II, finding that

regardless of whether Count II is interpreted as a claim alleging "breach of the implied covenant

of good faith and fair dealing" or as a claim of "bad faith," ChemTreat has failed to state a claim

under New York law.

## II.  Applicable Legal Standards

### A.    Standard of Review:  Rule 56

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record

as a whole and in the light most favorable to the nonmoving party, determines that there exists no

genuine issue of material fact, and that the moving party is entitled to judgment as a matter of

law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Liberty Lobby*, 477 U.S. at

248–50.

"A fact is material if the existence or non-existence thereof could lead a [finder of fact] to

different resolutions of the case." *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 628 (E.D. Va.

2016) (citing *Liberty Lobby*, 477 U.S. at 248). Once a party has properly filed evidence

supporting its motion for summary judgment, the nonmoving party may not rest upon mere

allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues

for trial. *Celotex Corp.*, 477 U.S. at 322–24. The parties must present these in the form of

exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most

favorable to the nonmoving party. *Liberty Lobby*, 477 U.S. at 255. Whether an inference is

reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of his [or her] evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (*en banc*) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

Where the court is faced with cross-motions for summary judgment, as in the instant case, the court must review each motion separately on its own merits. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). On cross motions for summary judgment, "each motion [is] considered individually, and the facts relevant to each [are] viewed in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

**B.     Principles of Insurance Contract Interpretation Under New York Law**

In New York, "[a]n insurance agreement is subject to principles of contract interpretation." *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 37 N.E.3d 78, 80 (N.Y. 2015). "[U]nambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court." *Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 71 N.E.3d 556, 560 (N.Y. 2017). However, where an insurance "policy may be reasonably interpreted in two conflicting manners, its terms are ambiguous." *Id.* (internal citations omitted). "[A]mbiguities in an insurance policy are . . . to be construed against the insurer, particularly when found in an exclusionary clause." *Ace Wire & Cable Co., Inc. v. Aetna Cas. & Sur. Co.*, 457 N.E.2d 761, 764 (N.Y. 1983). Parties to an insurance contract however "cannot create ambiguity from whole cloth where none exists, because provisions are not ambiguous merely because the parties

14

interpret them differently." *Nat'l Union Fire Ins. Co. of Pittsburgh*, 37 N.E.3d at 80 (internal citations omitted).

Under these principles, policy exclusions "must be specific and clear in order to be enforced." *Seaboard Sur. Co. v. Gillette Co.*, 476 N.E.2d 272, 275 (N.Y. 1984). The New York Court of Appeals has cautioned that policy exclusions are "not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." *Id.* "[B]efore an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case, . . . and that they are subject to no other reasonable interpretation." *Lend Lease (US) Constr.*, 71 N.E.3d at 561 (internal citations omitted); *see also Quanta Lines Ins. Co. v. Inv'rs Capital Corp.*, No. 06cv4624, 2009 WL 4884096, at *16 (S.D.N.Y. Dec. 17, 2009). While the insurer must provide some degree of coverage in return for the insured's consideration, an insurance policy "is not illusory if it provides coverage for some acts subject to a potentially wide exclusion." *Lend Lease (US) Constr.*, 71 N.E.3d at 562 (internal citations and alterations omitted).

In determining an insured's knowledge of a fact or event under an insurance policy, courts applying New York law first ask the "subjective question of whether the insured had knowledge of the relevant facts." *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *16. "[T]he first prong requires the insurer to show the insured's knowledge of the relevant facts prior to the policy's effective date." *Liberty Ins. Underwriters, Inc. v. Corpina Piergrossi Overzat & Klar LLP*, 78 A.D.3d 602, 604–05 (N.Y. App. Div. 2010). Second, courts ask the "the objective question of whether a reasonable person in the insured's position would foresee that those facts might be the basis of a Claim." *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *16; *Corpina Piergrossi Overzat & Klar LLP*, 78 A.D.3d at 604–05 (accord).

15

Where, as with the three Exclusions here,[9] the policy exclusion limits a policyholder's ability to recover based on reporting of events prior to the policy's inception date, New York courts apply the subjective/objective framework outlined in *Quanta Lines Insurance Company* regardless of whether the policies are explicitly labeled "prior knowledge" exclusions.[10] No. 06cv4624, 2009 WL 4884096, at *16 (S.D.N.Y. Dec. 17, 2009); *see also Schlather, Stumbar, Parks & Salk, LLP v. One Beacon Ins. Co.*, No. 5:10cv0167, 2011 WL 6756971, at *7 (N.D.N.Y. Dec. 22, 2011) (applying subjective/objective framework to "Known Claims Exclusion" where policy language did not explicitly mention the term "prior knowledge"); *Corpina Piergrossi Overzat & Klar LLP*, 78 A.D.3d 602, 605 (applying subjective/objective framework to policy language that did not mention "prior knowledge" but exclusion depended

---

[9] The Retroactive Limitation Clause, the Excluding Matters Exclusion, and the Prior Knowledge Exclusion—limit ChemTreat's ability to recover under the Policy based on ChemTreats's knowledge of events occurring prior to the Policy's inception date of July 1, 2017.

[10] The Court finds the Policy language regarding the definition of a "claim" and "circumstance" to be unambiguous. ChemTreat contends that the exclusions are ambiguous because "[t]he Policy does not expressly state from whose perspective this reasonableness requirement must be determined – whether from the insured's subjective view, the Underwriters' subjective view, or an objective view." (Mem. Supp. ChemTreat Mot. Summ. J. 20, ECF No. 35.) Likewise, in response and without citation, ChemTreat states that application of the Retroactive Limitation Clause involves "a purely subjective" review. (Resp. Opp. Underwriters Mot. Summ. J. 14, ECF No. 37.)

Notably, ChemTreat fails to direct the Court to a single New York insurance case that has applied a purely subjective analysis to a policy exclusion that relies on the knowledge of the insured at the time of the policy's inception. In briefing, ChemTreat adopts the framework outlined in *Quanta Lines Insurance Company* for assessing the Prior Knowledge Exclusion and Excluding Matters Exclusion. But it cites no reason why the Retroactive Limitation Clause, similarly relying on the previous knowledge of the insured, should not utilize the same framework. (*See* Mem. Supp. ChemTreat Mot. Summ. J. 26.) The Court sees none. As discussed at length here, New York law on this matter is well-settled. A court should determine the reasonableness of the insured's view from the perspective of an objectively reasonable insured. *B Five Studio LLP v. Great Am. Ins., Co.*, 414 F. Supp. 3d 337, 339 (E.D.N.Y. 2019); *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *16; *CPA Mut. Ins. Co. of Am. Risk Retention Grp.*, A.D. 3d at 432. Therefore, the Policy language is not ambiguous as to whether an objective or subjective standard applies.

on insured's knowledge of relevant facts prior to the policy's effective date); *Citak & Citak v. St. Paul Travelers Cos., Inc.*, No. 07cv5459, 2008 WL 1882660, at *3 (S.D.N.Y. Apr. 28, 2008) (applying subjective/objective framework to policy language that did not include "prior knowledge" but foreclosed coverage where insured "knew or could have reasonably foreseen that [their actions] . . . might be expected to be the basis of a 'claim' or 'suit'") (internal quotation marks and citation omitted). Notably, the Court of Appeals of New York has also referred to the subjective/objective test regarding an insured's knowledge of events that may give rise to a claim generally as "prior knowledge exclusions." *Exec. Risk Indem. Inc. v. Pepper Hamilton LLP*, 919 N.E.2d 172, 176 (N.Y. 2009) (interpreting Pennsylvania law).

### III. Analysis: Underwriters' Duty to Indemnify ChemTreat

The Court concludes that applying principles of New York law, and giving the Policy language its plain and ordinary meaning, the Policy does not require Underwriters to indemnify ChemTreat for the loss it suffered as a result of defending and settling the Windsor Action.

Under the Retroactive Limitation Clause and the Excluding Matters Exclusion, the Policy does not cover any losses relating to a "fact, event or situation that could reasonably be the basis for a Claim [against ChemTreat]" occurring before the Policy inception date. (Policy 25.) Because a reasonable insured in ChemTreat's position, and with knowledge of the same facts, would have foreseen that the Explosion "could reasonably be the basis" for a claim against it, the Excluding Matters Exclusion and the Retroactive Limitation Clause apply. (*Id.*) Similarly, because ChemTreat's provision of services to Valley Proteins regarding the boiler constitute an "act" which a member of ChemTreat's legal department or another officer "could have reasonably foreseen . . . might be expected to be the basis of a Claim," the Prior Knowledge Exclusion applies. (*Id.* 16–17.)

17

The Court first discusses ChemTreat's subjective knowledge of the facts surrounding the Explosion and the three pre-suit letters. Second, the Court determines that an objective insured, with knowledge of those same facts, would have considered the Explosion to be a "fact, event or situation that could reasonably be the basis for a Claim" against it. (*Id.* 25.) Third, the Court finds that under the plain language of the Policy, ChemTreat's knowledge of the Explosion and pre-suit correspondence prevent it from recovering under the Excluding Matters Exclusion, the Retroactive Limitation Clause, and the Prior Knowledge Exclusion.

A.   **Subjective Prong: ChemTreat's Knowledge of the Relevant Facts**

In determining an insured's knowledge of a fact or event under an insurance policy, courts applying New York law first ask the "subjective question of whether the insured had knowledge of the relevant facts." *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *16. On July 1, 2017, the date the Policy went into effect, ChemTreat had subjective knowledge of a number of facts concerning: (1) the Explosion, and its connection to the failed HPCR; (2) the two letters from Mid-South—not ChemTreat's customer—stating that it had "potential claims" against ChemTreat; and, (3) the letter from Counsel for Windsor served by process connecting ChemTreat to the boiler and asking it to preserve all evidence relating to the matter while attaching a copy of a boiler service report prepared by a ChemTreat employee. ChemTreat therefore had knowledge of the relevant facts.

First, ChemTreat knew that a boiler vessel at Valley Proteins had exploded, injuring Mr. Windsor. On April 13, 2016, in issuing the first litigation hold, ChemTreat's general counsel, stated that "there was an explosion involving the boiler at the . . . facility." (Apr. 13, 2016 Litigation Hold.) ChemTreat also knew that prior to the Explosion, it had "provided industrial water treatment services to Valley Proteins for its boiler system, including on-site services such

18

as water quality testing of the HPCR." (ChemTreat Answer ¶¶ 26, 42.) ChemTreat therefore

knew that it had performed services related to the chemical integrity of the HPCR, and the HPCR

had exploded.

Second, ChemTreat knew that Mid-South had sent it two letters—on March 15, 2016 and

May 5, 2017 respectively—informing ChemTreat that Mid-South may have claims against it.

Specifically, the March 15, 2016 Letter stated that Mid-South was "writing to place you on

notice of potential claims *Mid-South* may have against you, including, but not limited to, claims

for indemnity and/or contribution." (Mar. 15, 2016 Letter (emphasis added).) Both of Mid-

South's letters also asked ChemTreat to "forward this letter to your insurance carrier(s)" and

"preserve all evidence and potentially relevant or discoverable documents, items, or

information." (*See* Mar. 15, 2016 Letter 1; May 5, 2017 Letter 1.)

Similarly, the May 5, 2017 Letter, sent as a "supplement to [Mid-South's] prior notice of

potential claims . . . against [ChemTreat]," notified ChemTreat that Valley Proteins had sued

Mid-South in the Eastern District of Virginia for its "defective, deficient, improper and

inadequate treatment of the pressure vessel tank during fabrication and manufacturing in order to

relieve stress prior to the sale, supply, distribution, and installation of the pressure vessel tank."

(May 5, 2017 Letter 2, 8.) The May 5, 2017 Letter repeated to ChemTreat that *Mid-South* may

have potential claims against it regarding the Explosion. Indeed, Mid-South tied those potential

claims to the already pending litigation: "Mid-South may have claims against you *with respect*

*to the matters raised in the lawsuit*, including *for indemnity and/or contribution*." (*Id.* 2

(emphasis added).) The May 5, 2017 Letter also informed ChemTreat of the disposition of

certain evidence regarding the Explosion; namely, Valley Proteins plans to cut the pressure head

of the boiler and transport it to a different location and Mid-South's objections to that plan.[11] (*Id.*)

Finally, ChemTreat knew that Counsel for Windsor had been served with the June 5, 2017 Letter which again connected ChemTreat to the Explosion. The June 5, 2017 Letter stated that ChemTreat "provided services in connection with the [HPCR] and other pressure vessels and equipment at the facility, and that ChemTreat . . . also provided training to Valley Proteins employees in connection with such equipment." (June 5, 2017 Letter 4.) The June 5, 2017 Letter also identified fifteen categories of documents and evidence to be preserved and generally "demand[ed] the preservation of . . . evidence related to the [HPCR], the Valley Proteins facility in Accomac, Virginia, and the Incident." (*Id.*) These categories included, among others, "[a]ny test reports or results, inspection reports, sampling records, or similar documentation concerning the *testing, inspection, and sampling* of the HPCR." (*Id.* 5 (emphasis in original).) The letter also sought presentation of "**all Boiler Service Reports** or similar documents relating to the HPCR" and appended a copy of an inspection "report" signed by ChemTreat employee Adam Hildebrandt that Windsor had obtained pre-litigation. (*Id.* 5, 7–8 (emphases in original).) And the letter sought presentation of "[a]ll correspondence, documents and electronic

---

[11] Regarding knowledge, ChemTreat emphasizes that it knew that Valley Proteins would not sue them because "Valley Proteins never pointed the finger at ChemTreat" regarding the Explosion. (Mem. Support ChemTreat Mot. Summ J. 19.) Because Valley Proteins "intended to continue using ChemTreat's services once the facility was repaired" and because the lawsuit forwarded by Mid-South did not name ChemTreat as a defendant, ChemTreat argues that "no reasonable factfinder could find – without the benefit of hindsight, upon which Underwriters so heavily rely – that the Explosion, in and of itself, could reasonably be the basis for a demand for money or services against ChemTreat." (*Id.* 15–16.)

But as addressed in detail later, ChemTreat also knew that Valley Proteins did not send those two letters: Mid-South did. And even after Mid-South knew it was defendant in a live action, Mid-South notified ChemTreat that it—not ChemTreat's customer—"may have claims against you with respect to the matters raised in the lawsuit, including for indemnity and/or contribution." (May 5, 2017 Letter 1.)

communications concerning **training** that your provided to employees at the Valley Proteins, Inc. facility." (*Id.* 5 (emphasis in original).)

ChemTreat thus had knowledge of the Explosion, its connection to the vessel involved in the Explosion, and three letters from potential plaintiffs other than its customer Valley Proteins.

### B.    Objective Prong:  A Reasonable Insured with Knowledge of the Same Facts Would Have Foreseen That the Explosion Reasonably Could Be the Basis of a Claim Against It

Under the objective prong of the analysis, a reasonable insured, with knowledge of the Explosion and the three pre-suit letters, "would [have] foresee[n] that those facts might be the basis of a Claim." *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *16.

ChemTreat knew that a pressure vessel in a boiler system at the Valley Proteins's facility had exploded, and that ChemTreat had serviced that same pressure vessel to maintain and monitor chemical integrity.  ChemTreat knew that the Explosion had caused serious damage and injured a Valley Proteins employee.  Furthermore, before July 1, 2017, the date on which the Policy began, ChemTreat received two letters from Mid-South, the stated purpose of which was to place ChemTreat on "notice of potential claims" against it. (Mar. 15, 2016 Letter; May 5, 2017 Letter.)  And yet another party, Terry Windsor, had written to ChemTreat, detailing ChemTreat's connection to the failed boiler vessel and demanding the preservation of evidence relating to its activities. (*See* June 5, 2017 Letter.)

A reasonable insured, with knowledge of a catastrophic event that was intimately tied to its own activities, who received two letters explicitly notifying it that another entity had "potential claims" against it, and another letter from an injured party seeking the preservation of evidence, would have foreseen that the Explosion might be the basis of a claim against it.  Under

21

the law of New York, ChemTreat had prior knowledge of a circumstance which might be expected to be the basis of a claim against it and cannot recover under the Policy.

### 1.    Courts Have Found That Similar Pre-Suit Letters Have Informed Insureds About Potential Suits Against Them

At least one court applying New York law has treated similar pre-suit letters as probative as to whether an objective insured would have reasonably foreseen that an event might give rise to a claim.  In *B Five Studio LLP v. Great American Insurance, Co.*, a subcontractor was hired to provide design services in a condominium project.  414 F. Supp. 3d at 339.  Following construction, the condominium association sent a letter to the project manager stating that there were "certain design defects on the property" and threatening litigation against him, his companies, and the subcontractors.  *Id.*  The subcontractor purchased an insurance policy shortly thereafter, but did not disclose the letter or the problems with the project.  *Id.*  The condominium association filed suit, and the subcontractor sought indemnification from the insurer.  *Id.*

Considering the insured subcontractor's knowledge at the time of the policy inception, the United States District Court for the Eastern District of New York concluded that it "cannot be said that [the insured] lacked the objective understanding of a reasonable business person that [it] may be subject to a claim."  *Id.* at 341.  Dismissing the insured's subjective belief that a claim was not foreseeable because the condominium association's letter did not mention the insured by name, the *B Five* Court found that the letter informed the insured of the possibility of a suit, and that the insured therefore "had prior knowledge of the basis for the claim," *id.*, and denied coverage under the insurance policy provision.

As in *B Five*, ChemTreat received correspondence informing it that:  (1) an adverse event that could give rise to a claim had occurred; (2) that event bore a relation to particular services the insured had performed; and, (3) that certain entities could have potential claims against it.

Unlike *B Five*, those letters were addressed directly to ChemTreat, and asked ChemTreat to take specific steps regarding the preservation of evidence, notification of insurers, and notification of counsel.  Furthermore, ChemTreat received two letters informing it that an entity had "potential claims" against it "for indemnity and/or contribution," while a third letter identified another potential plaintiff, Mr. Windsor.  (*See* May 5, 2017 Letter 1.)  The second letter included a complaint where the entity sending the notice of potential claims "for indemnity and/or contribution" in relation to the boiler explosion, Mid-South, was already a defendant in a lawsuit relating to that occurrence.  (*Id.*)  This is especially true because these letters did not come from ChemTreat's client Valley Proteins.  Valley Proteins's decision not to sue and to continue working with ChemTreat is of no moment when the letter came from a different entity.  It is *Mid-South* notifying ChemTreat of "indemnity and/or contribution" claims against ChemTreat. (May 5, 2017 Letter 1.)  Given that Mid-South also notified of ChemTreat of active litigation against it, this meets the objective test.

ChemTreat, as a reasonable insured, had far more reason than the insured in *B Five* to foresee that its provision of services in relation to the HPCR might be the basis of a claim against it.  Under New York law, a reasonable insured would have foreseen that these letters, combined with an insured's connection to the basis of the potential lawsuit, might be the basis of a potential claim against it.  *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *16.

Case law confirms this finding.  At least one other court outside of New York has similarly found that letters warning an insured of potential claims against it for professional malpractice can inform the foreseeability of a potential claim against an insured.  In *James River Insurance Co. v. Brick House Title*, *LLC*, the United States District Court for the District of Maryland found that a letter warning an insured of a "potential claim" against it and seeking

further information about an incident triggered an insurance policy's prior knowledge exclusion, because an "objectively reasonable" insured would have foreseen that a claim could arise. No. 16cv3464, 2017 WL 5126154, at *7 (D. Md. Nov. 6, 2017).[12]

Similarly, courts have found that letters warning of potential claims and asking parties to forward the correspondence to their insurance carriers would lead an objective insured to foresee that a claim might reasonably arise. *See, e.g., Eddy v. Cont'l Cas. Co.*, 784 F. Supp. 2d 1331, 1341–42 (M.D. Fla. 2011) (applying an exclusion where insured objectively could have foreseen professional liability claim because letter directed insured to provide notice to its insurance carrier); *Rentmeester v. Wis. Lawyers Mut. Ins. Co.*, 473 N.W.2d 160, 162 (Wisc. Ct. App. 1991) (finding letter expressing dissatisfaction with a lawyer's in court result and asking him to "notify [his] professional insurance carrier of this matter" triggered prior knowledge exception).

Here, both of Mid-South's letters asked ChemTreat to notify its insurance carrier of the correspondence, and the May 5, 2017 Letter further requested that "if you are represented by counsel in this matter, please ask them to contact us, so that we will know to communicate directly with them." (May 5, 2017 Letter.) Given these warning signs, and Mid-South's explicit requests for ChemTreat to notify its insured in relation to "potential claims" against it, an objective insured would have reasonably foreseen the potential of a claim arising from the Windsor Action. (*Id.*)

---

[12] The well-established principles of notice and foreseeability in this case extend even into admiralty law. In the context of certain federal admiralty claims, courts have found that letters informing an insured of potential liability and requesting the insured forward the letter to their insurance carrier, even if the letter does not threaten legal action, can provide "written notice of a claim." *See Complaint of Bayview Charter Boats, Inc.*, 692 F. Supp. 1480, 1485–86 (E.D.N.Y. 1988) (finding insured possessed notice of a claim against it where letter informed owner of details of incident, asked owner to forward letter to insurer, and stated possibility that claimant would hold the owner liable for injuries).

ChemTreat thus had knowledge of letters from Mid-South warning it of (1) "potential claims against it "for indemnity and/or contribution"; (2) asking ChemTreat to notify its insurers of these potential claims; (3) asking ChemTreat if it had Counsel in the matter; (4) notifying ChemTreat that Mid-South had been sued in relation to the Explosion and enclosing that suit; and, (5) notifying ChemTreat about the potential destruction of evidence which could later prove relevant to its defense of any suit. (Mar. 15, 2016 Letter; May 5, 2017 Letter.) In sum, there are at least five reasons the objective prong is met from the Mid-South letters alone.

> **2.      ChemTreat's Actions Following the Receipt of the Pre-Suit Letters Further Demonstrate that a Reasonable Insured Would Believe the Explosion Reasonably Could Be the Basis for a Claim Against It**

ChemTreat's actions following the boiler explosion further demonstrate that a reasonable insured might have expected a claim. Following the receipt of the March 15, 2016 Letter from Mid-South and the June 5, 2017 Letter from Counsel for Windsor, ChemTreat's General Counsel issued two litigation holds to preserve evidence relating to ChemTreat's work for Valley Proteins. (Apr. 13, 2016 Litigation Hold; June 14, 2017 Litigation Hold.) While the Litigation Holds expressed ChemTreat's subjective belief that ChemTreat was not at fault for the Explosion, they also expressly recognized the possibility of litigation. (*See id.*) In the April 13, 2016 Litigation Hold, ChemTreat's General Counsel states that "[i]n the event of litigation related to the incident at the [Valley Proteins]-Accomac Facility, we do not want a plaintiff to be able to prop up unsupported claims by manufacturing side-issues about destruction of evidence." (Apr. 13, 2016 Litigation Hold.) The June 14, 2017 Litigation Hold expressed the same awareness of potential litigation, albeit again contemplating only Valley Proteins as a potential plaintiff. (*See* June 14, 2017 Litigation Hold.) ChemTreat's General Counsel issued the June 14, 2017 Litigation Hold just seventeen days before the Policy went into effect on July 1, 2017.

A "litigation hold" is a legal term of art describing "[a] notice issued in anticipation of a lawsuit or investigation, ordering employees to preserve documents and other materials relevant to the lawsuit or investigation." *Litigation Hold*, Black's Law Dictionary (9th ed. at 800.) While ChemTreat's subjective view of the likelihood of a claim does not control, ChemTreat's internal decision to issue the Litigation Holds demonstrates that it, at a minimum, anticipated the possibility of some claim, and "a reasonable person in the insured's position would foresee" that the Explosion "might be the basis of a Claim" against more than Valley Proteins or Mid-South. *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *16.[13] ChemTreat cannot persuasively argue that a reasonable insured would not have foreseen or reasonably expected a potential claim.

### 3.    ChemTreat Cannot Rely On Its Subjective and Post-Hoc Belief That a Claim Against It Was Unlikely or Unmeritorious

ChemTreat disputes that a reasonable insured would have foreseen a potential claim, arguing: (1) that several of the pre-suit letters were "form" letters which "put ChemTreat in no better position to determine if and to what extent its services at the facility could possibly have contributed to the Explosion;" (2) that Valley Proteins never "pointed the finger at ChemTreat" in the aftermath of the Explosion; and, (3) that a reasonable insured would not have expected a

---

[13] ChemTreat argues the Litigation Holds do not necessarily show that it expected litigation against them, instead arguing that the "litigation hold letters at issue here can just as easily be interpreted to reflect ChemTreat's desire to help out its customer, Valley Proteins, in any litigation Valley Proteins might bring (and, in fact, did bring) against entities it deemed responsible for the Explosion, such as Mid-South, by preserving ChemTreat's records in case Valley Proteins should need them." (Resp. Opp. Underwriters Mot. Summ. J. 16, ECF No. 37.)

ChemTreat issued the second Litigation Hold upon receipt of the Windsor Letter, after Valley Proteins had filed suit against Mid-South. ChemTreat's proffered explanation of issuing the Litigation Holds to help its customer Valley Proteins, and not in anticipation of litigation, cannot prevail viewing *reasonable* inferences favorably to ChemTreat after receipt of two letters from a defendant asserting possible indemnity or contribution claims, and one from the representative of an injured victim that specifically attached ChemTreat's boiler inspection reports.

claim because the pre-suit correspondence "did not state or even suggest that ChemTreat's services caused or contributed to the Explosion." (Mem. Supp. ChemTreat Mot. Summ. J. 16–19, 22.) Because each of these contentions improperly rely on ChemTreat's hindsight or subjective beliefs and misread the Policy language, the Court rejects them in turn.

a.    **ChemTreat's Belief That the Pre-Suit Letters Were Not Significantly Probative of Whether a Claim Might Arise**

ChemTreat argues that the March 15, 2016 Letter from Mid-South and the June 5, 2017 Letter from Counsel for Windsor were form letters that did not inform it of how its services could have caused the Explosion.  In particular, ChemTreat describes the language of the March 15, 2016 Letter as "contain[ing] statements typical of generic notice letters, stating things like, Mid-South's investigation is 'ongoing' and claiming that MidSouth may have 'potential claims' against the recipients, including for 'indemnity and/or contribution.'" (Mem. Supp. ChemTreat Mot. Summ. J. 16.)  ChemTreat argues that the fact that the March 15, 2016 Letter was sent to thirty-seven separate entities shows that a reasonable insured would not have considered it relevant in assessing the probability of a Claim.  (*Id.*)  ChemTreat similarly dismisses the June 5, 2017 Letter from Counsel for Windsor as it "appeared to be a form document preservation letter." (*Id.* 18.)  ChemTreat's post-hoc and subjective beliefs about the import of these letters, however, do not control for several reasons.

First, ChemTreat did not discover that Mid-South had sent similar forms of the March 15, 2016 Letter to thirty-seven other entities until it received that information after it received the Lown and Blake Declarations, which were signed on September 20, 2019, over two years after the Policy went into effect.[14]  Under New York law, facts discovered after the policy's inception

_____

[14] Mr. Lown and Mr. Blake signed their Declarations, provided in response to ChemTreat's subpoena, on September 20, 2019.  (Blake Decl. 2, 5; Lown Decl. 2, 7.)

27

date are irrelevant to the question of the insured's knowledge of a fact or circumstance. *See Corpina Piergrossi Overzat & Klar LLP*, 78 A.D.3d at 604–05 ("[T]he first prong requires the insurer to show the insured's knowledge of the relevant facts *prior to the policy's effective date* . . . . " (emphasis added)). ChemTreat does not claim to have known on July 1, 2017—the Policy inception date—that the March 15, 2017 Letter was sent to thirty-seven entities.

Second, any backward-looking evidence might weaken ChemTreat's argument that the pre-suit correspondence did not give them a reason to foresee a potential claim. Although Mid-South originally sent letters of "potential claims" to thirty-seven entities, the record before the Court shows that Mid-South sent the May 5, 2017 Letter only to ChemTreat.[15] (*See* May 5, 2017 Letter.) Thus, even accepting ChemTreat's premise that the March 15, 2016 Letter was a "form" letter, the May 5, 2017 Letter was assuredly not. The May 5, 2017 Letter was also more specific in its notice of potential claims against ChemTreat, stating that "Mid-South may have claims against you with respect to the matters raised in the [Valley Proteins] lawsuit, including for indemnity and/or contribution." (*Id.*) The May 5, 2017 Letter thus warned ChemTreat, and only ChemTreat, that Mid-South may have claims for indemnification against it arising under active litigation. Under ChemTreat's approach, a reasonable insured in ChemTreat's position would surmise that Mid-South had narrowed the entities it had "potential claims" against from thirty-seven to one, thus substantially increasing the foreseeability of a claim relating to the Explosion. (*Id.*)

Similarly, the fact that Counsel for Windsor had served the Windsor Letter by service of process and requested ChemTreat preserve fifteen categories of documents would have led a

---

[15] The record shows that Counsel for Windsor served an almost identical letter to only one other entity: Tate Engineering. (ECF No. 35-10.)

reasonable insured to potentially expect a claim, even if Counsel for Windsor had sent a similar letter to a different company.  Even reading facts favorably to ChemTreat and drawing all reasonable inferences in its favor, this rings particularly true where the Windsor Letter contained information specific to ChemTreat involving its employee's inspection of the HPCR.  (Windsor Letter 7–8.)  Even under ChemTreat's hindsight approach, it possessed knowledge on July 1, 2017 that the Explosion could reasonably prove to be the basis for a claim against it.

Third, and finally, ChemTreat cannot rely on its subjective view that the three pre-suit letters were not significantly indicative of whether a claim was foreseeable.  New York courts have routinely stated that the proper inquiry is whether an objectively reasonable insured would have foreseen a claim based on the facts known to it before the policy period.  *See, e.g.*, *B Five Studio LLP*, 414 F. Supp. 3d at 340 (finding insured's claim that "it lacked subjective knowledge" that prior events might lead to a claim unpersuasive where an objectively reasonable insured would have expected a claim); *CPA Mut. Ins. Co. of Am. Risk Retention Grp. v. Weiss & Co.*, 80 A.D.3d 431, 432 (N.Y. App. Div. 2011) ("Defendants' subjective belief they were not facing a claim . . . would not have warranted a different result . . . . The record shows that such a belief would not have been reasonable under the circumstances."); *Citak & Citak*, 2008 WL 1882660, at *3 ("Courts determine whether an insured is on notice of a potential claim using an objective reasonableness standard").

As stated above, a reasonable insured in ChemTreat's position would have foreseen that the Explosion "could reasonably be the basis for a Claim" against it.  (Policy 25.)  The two letters from Mid-South expressly warned ChemTreat that it might have claims for indemnification or contribution against it, and requested that ChemTreat forward those letters to its insurance carrier.  In particular, the May 5, 2017 Letter put ChemTreat on notice that claims

for "indemnification and/or contribution" could emerge from a legal action that was already pending, and further advised ChemTreat of the potential spoliation of evidence which could prove essential to ChemTreat's defense of such a claim. (May 5, 2017 Letter 1.)

By the plain terms of those letters, ChemTreat became aware that the Explosion "could reasonably be the basis for a Claim" against it. (Policy 25.) Allowing ChemTreat to dismiss the clear significance of these letters on the basis of their subjective and unfounded belief that they somehow lacked import or were form letters would not only contradict New York law, but yield unpredictable results. As the United States Court of Appeals for the Third Circuit has stated in rejecting an insured's claim that a subjective standard should apply in assessing the foreseeability of a claim:

> an exclusion which depended on a subjective standard for the second part of the inquiry would reward ignorance and encourage [the insured] to engage in disingenuous statements and after-the-fact justifications, which in turn would lead to unpredictable outcomes. . . . Accordingly, a policy exclusion which requires an objective test for the second part of the necessary inquiry constitutes a reasonable attempt by the insurer to limit this moral hazard.

*Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 240 (3d Cir. 2006). ChemTreat cannot avoid the clear import of these letters warning it of future legal action against it when a reasonable insured would have foreseen that the three letters, along with their connection to the HPCR, "could reasonably be the basis for a Claim." (Policy 25.) The Court must reject ChemTreat's argument that its subjective belief that the pre-suit letters from Mid-South and Windsor were not probative of whether a claim might be filed.

    **b.**  **ChemTreat's Subjective Belief That It Was Not at Fault Because Valley Proteins Continued Its Relationship with It Does Not Control**

ChemTreat next contends that it did not subjectively anticipate a Claim because Valley Proteins "never pointed the finger at ChemTreat" and "indicated to ChemTreat that it intended to

continue using ChemTreat's services." (Mem. Supp. ChemTreat Mot. Summ. J. 15, 19.) This contention falters because Valley Proteins was only one of several possible claimants.

In support of its contention, ChemTreat cites a number of cases in which courts found a client's willingness to continue in a business relationship with an insured relevant to assessing the potential for a claim. However, each of these cases is factually inapposite. *See United Nat'l Ins. Co. v. Granoff, Walker & Forlenza, P.C.*, 598 F. Supp. 2d 540, 548 (S.D.N.Y. 2009) (finding denial of coverage improper in legal malpractice case when client continues to use lawyer but then sues post-policy); *Gen. Ins. Co. of Am. v. Rhoades*, 196 F.R.D. 620, 628 (D.N.M. 2000) (finding factual issue for trial of whether attorney had notice of potential claim against him where client evinced willingness to continue using attorney's services); *Fremont Indem. Co. v. Lawton-Byrne-Bruner Ins. Agency Co.*, 701 S.W.2d 737, 742–43 (Mo. Ct. App. 1985) (finding broker had no reasonable basis to expect claim against her under professional liability policy where hospital continued to use her services after the basis for the claim occurred). Under a professional malpractice policy, it would be more reasonable to rely on a client's representations that the client did not view an insured to be at fault for an incident, as the client likely represents the only possible claimant.

But Mid-South was not ChemTreat's client. Nor was Windsor. In the case at bar, ChemTreat was distinctly aware that there could be multiple claimants in relation to the Explosion; indeed, Mid-South had informed ChemTreat on two occasions that it might have "potential claims" against ChemTreat. (Mar. 15, 2016 Letter; May 5, 2017 Letter.) Mid-South had also stated in its letter to Valley Proteins, which it provided to ChemTreat, that it believed Windsor also "intend[ed] to file a lawsuit." (May 5, 2017 Letter.) Shortly thereafter, Counsel for Windsor confirmed Mid-South's representation, and indicated that it might file a lawsuit,

although it does not specify against whom, regarding the Explosion. (*See* June 5, 2017 Letter.)
Given these circumstances, a reasonable insured could not have relied on representations made
by Valley Proteins, or lack thereof, to assess the possibility of a claim brought by a
different entity.

**c.    The Pre-Suit Correspondence Did Not Connect the Explosion
to an Affirmative Error on the Part of ChemTreat**

Finally, ChemTreat contends that that a reasonable insured would not have expected a
claim because the pre-suit correspondence "did not state or even suggest that ChemTreat's
services caused or contributed to the Explosion . . . [n]or did the letter assert any act, error,
omission, or other specific facts that would implicate ChemTreat in any manner of alleged
wrongdoing." (Mem. Supp. ChemTreat Mot. Summ. J. 17.)  This contention misreads New
York law and the Policy language, neither of which require an insured to be aware of a specific
act of wrongdoing for the exclusions at bar to apply.

In determining whether an insured reasonably foresaw a claim, courts ask the "the
objective question of whether a reasonable person in the insured's position would foresee that
those facts [known to an insured at the time] might be the basis of a Claim." *Quanta Lines Ins.
Co.*, 2009 WL 4884096, at *16.  A third-party does not need to allege a direct and causal link
between an insured's action and a resulting harm for an insured to reasonably foresee that a harm
might be the basis for the claim.  As the *B Five* Court stated, the "question is not whether [the
insured] would have 'expected a claim.'  Rather, the question is whether [the insured] was aware
of the 'relevant facts.'" *B Five Studio LLP*, 414 F. Supp. 3d at 340.

The undisputed facts, read favorably to ChemTreat, show that, prior to the Windsor
Action, no entity had alleged that ChemTreat had engaged in any specific wrongdoing that led
directly to the Explosion.  However, no such allegation of specific misconduct was necessary for

32

ChemTreat, as an objective insured aware of the "relevant facts," to reasonably foresee that a claim might arise in relation to the Explosion. *Id.* ChemTreat relies on a New York Superior Court case stating that "an insurance carrier seeking to disclaim coverage based on a prior knowledge exclusion bears a heavy burden to establish that the insured had knowledge of a 'clear breach of duty.'" *J.P. Morgan Sec. v. Vigilant Ins. Co.*, 51 N.Y.S.3d 369, 383 (N.Y. Sup. Ct 2017).[16] But in *J.P. Morgan*, the insurance policy in question disclaimed coverage for "any alleged Wrongful Act(s) committed prior" to the policy period. *Id.* at 381. Here, the Policy language differs materially: none of the three policy exclusions at issue require that ChemTreat possessed knowledge of a "Wrongful Act" at the time of the Policy inception. *Id.* They require only that ChemTreat have knowledge of facts that would lead an objective insured to reasonably expect a claim. And while the exclusions here may be broader than the exclusion in *J.P. Morgan*, an insurance policy "is not illusory if it provides coverage for some acts subject to a potentially wide exclusion." *Lend Lease (US) Constr.*, 71 N.E.3d at 562.

These exclusions, even read narrowly, are also valid under New York law. Prior or previous knowledge exclusions do not require an insured to have knowledge of a "wrongful act" in order for the exclusion to apply. *See, e.g., Pepper Hamilton LLP*, 919 N.E.2d at 176 ("the prior knowledge exclusion in this case does not require the known-of act, error, omission or circumstance to be wrongful conduct on the part of the insured.") (internal citations and quotations omitted). [17]

_____

[16] Amended, (N.Y. Sup. Ct. 2017), judgment rev'd on other grounds, appeal dismissed, 166 A.D.3d 1, 84 N.Y.S.3d 436 (2018), and judgment rev'd on other grounds, appeal dismissed, 166 A.D.3d 1, 84 N.Y.S.3d 436 (2018) (analyzing Securities and Exchange Commission ("SEC") disgorgement provision in unrelated policy exclusion but observing that lower court's interpretation of prior knowledge exclusion at issue above was not in error).

[17] ChemTreat also relies heavily on a Connecticut prior knowledge case (also involving a boiler explosion) in asserting that while ChemTreat knew that litigation was in the "realm of

Although an allegation on the part of Mid-South or Windsor that ChemTreat had "caused or contributed to the Explosion" would have increased the foreseeability of a claim against ChemTreat, (Mem. Supp. ChemTreat Mot. Summ. J. 17), such an allegation is not necessary to show that an objective insured would have reasonably foreseen that the Explosion might be the basis of a claim. Under New York law, the insured need not foresee that the claim have merit or prove successful, only that a claim may occur.[18]

---

possibility" based on receipt of the pre-suit letters, it was not reasonable to expect that a Claim might be made. *See Hartford Steam Boiler Grp. v. SVB Underwriting, Ltd.*, No. 3:04cv2127, 2011 WL 1899392, at \*10 (D. Conn. May 19, 2011). *Hartford Steam* is factually distinct, not as to an explosion, but as to post-explosion conduct.

In *Hartford Steam*, the insured party was responsible for inspecting a boiler. *Id.* at \*1. After an explosion at the plant where the boiler was located, the insured hired outside counsel to investigate the matter. *Id.* at \*4. During the course of the investigation, a "consensus emerged [among investigating parties] that the explosion was caused by the ignition of unconsumed natural gas from an undetermined source" and the boiler had not in fact exploded. *Id.* at \*5. Just two months after the explosion, a local newspaper published an article entitled "'Boilers Ruled Out in Blast.'" *Id.* While several potential plaintiffs and defendants contacted the insured regarding "'boiler' inspections . . . it was not the boiler itself that was being inspected, but ancillary equipment." *Id.* at \*10. None of these communications indicated that these parties had potential claims against the insured. *See id.* After several plaintiffs filed suit against the insured claiming negligent inspection of the boiler, the Court determined the insured did not have prior knowledge of an event that could reasonably give rise to a claim. *Id.* Thus, in *Hartford Steam*, (1) the insured hired an attorney right away; (2) several different people inspected the plant and determined that explosion was caused by gas and not a boiler explosion; (3) the boiler had not shattered as if it had exploded; (4) other inspectors, including the Michigan state inspector, had reached the same conclusion; and, (5) that consensus as to the lack of boiler causation was so strong that the press reported that as true two months after the accident. *Id.* at \*3–9.

The facts of *Hartford Steam* differ materially from those of the case at bar. The insured in *Hartford Steam* had no reason to connect its actions to the catastrophic event because the investigative consensus was that the boiler had not exploded at all. Here, ChemTreat knew that the HPCR, which it had serviced to ensure chemical integrity, had failed. Perhaps more importantly, no potential plaintiff had informed the insured in *Hartford Steam* that it had "potential claims" against it. Here, however, an entity contacted ChemTreat twice to warn ChemTreat that it might have potential claims against it. And the Windsor for Letter sought documents including ChemTreat's boiler reports. Under the facts of this case, a claim would be far more foreseeable to an objective insured than the insured in *Hartford Steam*.

[18] Policy exclusions based on prior knowledge of the insured serve an important purpose even where the potential suit appears frivolous, baseless, or only tangentially related to the insured's actions. As the United States Court of Appeals for the Tenth Circuit has stated

**C.     Because a Reasonable Insured with Knowledge of the Relevant Facts Would Have Foreseen That the Explosion Could Be the Basis for a Claim, the Three Policy Exclusions Apply**

Under the Policy language, ChemTreat cannot recover if it knew, at the time it agreed to the Policy terms, of "any fact, event or situation that could reasonably be the basis for a Claim." (Policy 25.)  Because the Explosion represented such a "fact, event or situation" that ChemTreat objectively knew could "reasonably be the basis for a Claim," the Retroactive Limitation Clause and the Excluding Matters Exclusion apply.  (*Id.*)  Similarly, because ChemTreat's provision of services to Valley Proteins constitute an "act" that members of ChemTreat's legal department "knew or could have reasonably foreseen . . . might be expected to be the basis of a Claim," the Prior Knowledge Exclusion applies.  (*Id.* 16–17.)

To reiterate, policy exclusions "must be specific and clear in order to be enforced." *Seaboard*, 476 N.E.2d at 275.  "Before an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation." *Lend Lease (US) Constr.*, 71 N.E.3d at 561 (internal citations omitted).

---

[t]he threat of a claim, even an unfounded one, is relevant to the insurer's exposure, because defense costs, which can be quite substantial, are covered by the policy even when the claim against the insured proves unsuccessful.  The reality of modern American litigation, which is what insurance policies are designed to protect against, is that persons must be prepared to defend against colorable albeit invalid claims.

*Cohen-Esrey Real Estate Servs, Inc. v. Twin City Fire Ins. Co.*, 636 F.3d 1300, 1305 (10th Cir. 2011) (applying Kansas law but citing New York law favorably and applying the subjective/objective test).  By including policy exclusions foregoing coverage on the basis of prior knowledge, the insurer protects itself not only from indemnifying the insured after successful claims, but from expending significant amounts of resources defending against "colorable albeit invalid" ones.  *Id.*

Furthermore, policy exclusions are "not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." *Seaboard*, 476 N.E.2d at 275.  Even according these three exclusions a narrow construction, Underwriters has met its burden of showing that the three Policy exclusions apply here, that they are subject to no other reasonable interpretation.

### 1.  The Policy's Retroactive Limitation Exclusion Bars Coverage for the Windsor Action

Because the Windsor Action arose out of a circumstance known to ChemTreat, but not disclosed to Underwriters prior to the Policy inception date of July 1, 2017, the Retroactive Limitation Clause bars coverage for the Windsor Action.

The Retroactive Limitation Clause states that: "[t]here shall be no liability hereunder in respect of any claim: . . . (b) arising out of any circumstance or occurrence known to the Assured prior to the inception hereof [July 1, 2017] and not disclosed to Underwriters at inception [July 1, 2017]."  (Policy 39.)  The Policy defines a circumstance as "any fact, event or situation that could reasonably be the basis for a Claim," (*id.* 25), but does not define "occurrence."

As part of the application process for the Policy, ChemTreat submitted to Underwriters a Miscellaneous Professional Indemnity Proposal Form.  (*See* ChemTreat App.)  As part of that application, ChemTreat answered "No" to the following question: "[a]fter enquiry, is the Applicant or any subsidiary or any person intended to be covered aware of any negligent act, error or omission or any other fact, complaint, circumstance or situation which may be expected to give rise to a claim against the Applicant or any subsidiary or any person intended to be covered?" (*Id.* 7.)

On July 1, 2017, ChemTreat was subjectively aware of the Explosion.  ChemTreat was also aware of several pre-suit letters which informed ChemTreat of potential claims against it and asked ChemTreat to preserve evidence relating to the Explosion in the case of litigation.

Accordingly, the Explosion constituted a "Circumstance" or "fact, event or situation" that in the eyes of an objective insured "could reasonably be the basis for a Claim."[19] (Policy 25, 39.) The Windsor Action arose out of the Explosion or the same "Circumstance." (*Id.* 25.)

Even according the Retroactive Limitation Exclusion the required strict and narrow construction, Underwriters, under the clear language of the Policy, has borne its burden to show that the Windsor Action arose out a of a Circumstance known to ChemTreat on July 1, 2017. Underwriters has therefore met its "burden" of showing that the Retroactive Limitation Exclusion bars coverage for the Windsor Action. *Lend Lease (US) Constr.*, 71 N.E.3d at 561 (internal citations omitted).

### 2. The Policy's Excluding Matters Exclusion Bars Coverage for the Windsor Action

As with the Retroactive Limitation Clause, the Excluding Matters Exclusion bars coverage for the Windsor Action. The Excluding Matters Exclusion states, in relevant part, that

> [t]his Policy shall not indemnify the Insured in respect of any claim, loss, liability or expense arising out of any claim or Circumstance (a) known to the Insured prior to the inception of this Policy [July 1, 2017] or which in the reasonable opinion of the Insurers ought to have been known . . .

---

[19] ChemTreat argues that the Explosion does not represent a "Circumstance" under the Policy because "no reasonable factfinder could find . . . that the Explosion, in and of itself, could reasonably be the basis for a demand for money or services against ChemTreat." (Mem. Supp. ChemTreat Mot. Summ. J. 15–16.) Furthermore, ChemTreat contends "the Post-Explosion Letters is not, in and of itself, a 'fact, event or situation' that 'could reasonably be the basis for a demand for money or services.'" (*Id.* 16.) ChemTreat's selective invocation of the Policy language does not persuade. Even according the exclusionary language the strict and narrow construction required, the Explosion plainly constitutes a "fact, event or situation" which in conjunction with ChemTreat's knowledge of its connection with the HPCR and facts contained in the pre-suit letters, becomes a "fact, event or situation" that "could reasonably be the basis for a claim." (Policy 25.) ChemTreat, as a reasonable insured, could view facts outside the isolated event of the Explosion—such as the statements of potential plaintiffs—as probative as to whether the Explosion would lead to a claim. The pre-suit letters were not claims or circumstances themselves, but rather factual developments which rendered a claim (the Windsor Action) arising from a circumstance (the Explosion) more foreseeable to an objective insured.

(Policy 44.)  As set forth above, the Explosion constituted a "Circumstance" or "fact, event or situation," known to ChemTreat, that in the eyes of an objective insured "could reasonably be the basis for a Claim." (*Id.* 25.)

Even according the Excluding Matters Exclusion the required strict and narrow construction, Underwriters, under the clear language of the Policy, has borne its burden to show that the Windsor Action arose out of a Circumstance known to ChemTreat prior to the inception of the Policy.  Underwriters has therefore met its "burden" of showing that the Excluding Matters Exclusion applies and bars coverage for the Windsor Action. *Lend Lease (US) Constr.*, 71 N.E.3d at 561 (internal citations omitted).

### 3.     The Policy's Prior Knowledge Exclusion Bars Coverage for the Windsor Action

Similar to the Retroactive Limitation Clause and the Excluding Matters Exclusions, the Prior Knowledge Exclusion bars coverage for the Windsor Action.  The Prior Knowledge Exclusion, states that the Policy will not cover

> Damages or Claims Expenses in connection with or resulting from any Claim . . . arising out of or resulting from any act, error or omission or Pollution Condition committed or arising prior to the inception date of this Insurance: (a) if any director, officer, principal, partner, insurance manager or any member of the risk management or legal department of the Assured Organization on or before the inception date [July 1, 2017] knew or could have reasonably foreseen that such act, error or omission or Pollution Condition might be expected to be the basis of a Claim . . . .

(Policy 16–17.)  To show that the Prior Knowledge Exclusion applies, Underwriters, as the insurer, bears the burden of showing that there was a:  (1) "Claim . . . arising out of or result from" an "act, error or omission;" and, (2) a "director, officer, principal, partner, insurance manager or any member of the risk management or legal department" of ChemTreat "knew or could have reasonably foreseen that such act, error or omission . . . might be expected to be the

basis of a Claim" before the Policy inception date.  (*Id.*); *see Lend Lease (US) Constr.*, 71 N.E.3d at 561 (internal citations omitted).

Underwriters has met its burden.  First, it has shown that there was a "Claim arising out of or resulting from" an "act"—namely, the Windsor Action arose out of ChemTreat's provision of services in connection with the HPCR.  (Policy 16–17.)  Second, it has shown that ChemTreat's General Counsel and ChemTreat's legal department "knew or could have reasonably foreseen" that ChemTreat's "act" or services "might be expected to be the basis of a Claim" at the Policy inception date.  (*Id.*)

Even according the Prior Knowledge Exclusion the required strict and narrow construction, Underwriters, under the clear language of the Policy, has borne its burden to show that the Windsor Action arose out of an "act" that ChemTreat could have knew or could have reasonably foreseen" that ChemTreat's "act" or services "might be expected to be the basis of a Claim" at the Policy inception date, (Policy 16–17).  Underwriters has therefore met its "burden" of showing that the Prior Knowledge Exclusion bars coverage for the Windsor Action.  *Lend Lease (US) Constr.*, 71 N.E.3d at 561 (internal citations omitted).

Because all three Policy exclusions at issue apply, the Court concludes that Underwriters had no duty to provide coverage for the Windsor Action.  The Court turns to the question of whether Underwriters were nonetheless required to defend ChemTreat in the Windsor Action.

### IV.  Analysis:  Underwriters' Duty to Defend

Having concluded that the Policy bars coverage for the Windsor Action, the Court determines that Underwriters did not have a duty to defend ChemTreat in that same suit.

In Count I of its Complaint, ChemTreat argues that "[b]ecause the claims pleaded against ChemTreat in the Windsor [Action] may rationally be said to fall within the Policy's coverage,

the Underwriters were obligated to provide ChemTreat with a defense" and that Underwriters breached its duty to defend.  (Compl. ¶ 69.)  Underwriters, in contrast, "seek a judicial declaration that they have no duty to defend or indemnify ChemTreat in the [Windsor Action]." (Underwriters Answer & Countercl. 26.)  The Court concludes that because Underwriters denied coverage on grounds outside the four corners of the Windsor Complaint and made a timely and reasonable investigation and subsequent denial of coverage, Underwriters did not breach their duty to defend under New York law.

A.      **Legal Standard:  Duty to Defend Under New York Law**

In New York, "[t]he duty of an insurer to defend its insured arises whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim, or where the insurer has actual knowledge of facts establishing a reasonable possibility of coverage." *Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 690 N.E.2d 866, 868 (N.Y. 1997) (internal quotations omitted).  "To be relieved of its duty to defend on the basis of a policy exclusion, the insurer bears the heavy burden of demonstrating that the allegations of the complaint cast the pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal  basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision." *Id.* at 868–69 (internal citations omitted).

An insurer's duty to defend is broader than its duty to indemnify, and an insurer has a duty to defend even if "facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 97 (2d Cir. 2002) (internal citations omitted).  An insurer's duty to defend ceases, however, if "it establishes as a matter of law that there is no possible factual or legal basis on which it might

eventually be obligated to indemnify its insured under any policy provision." *Id.* (internal citations omitted).[20]

"New York State law recognizes a narrow exception to the duty to defend, which permits a disclaimer of defense prior to litigation or a withdrawal during the course of litigation, if extrinsic evidence to the complaint or insurance policy is 'unrelated to the merits of the plaintiff's action [and] plainly take[s] the case outside the policy coverage.'" *Striker Sheet Metal II Corp. v. Harleysville Ins. Co. of N.Y.*, No. 2:16cv05916, 2018 WL 654445, at *9 (E.D.N.Y. Jan. 31, 2018) (internal citations omitted); *see also Burt Rigid Box, Inc.*, 302 F.3d at 97 ("New York courts have, in appropriate cases, considered extrinsic evidence where that evidence may conclusively establish that an insurer faces no possible liability."); *City of New York v. Liberty Mut. Ins. Co.*, No. 15cv8220, 2017 WL 4386363, at *15 (S.D.N.Y. Sept. 28, 2017) ("[U]nder New York law . . . extrinsic evidence cannot be used to defeat the duty to defend unless it is unrelated to the merits of the underlying plaintiff's action") (internal citations and alterations omitted). "To be relieved of its duty to defend on the basis of a policy exclusion, the insurer must demonstrate that the allegations of the complaint cast the pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no other possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision.'" *City of New York,* 2017 WL 4386363, at *8. But an insurer's duty to defend does not attach where "as a matter of law, there is no basis on

---

[20] In briefing, ChemTreat says Underwriters had no basis to deny ChemTreat a defense at all and "not even one that was 'merely arguable,'" (Resp. Opp. Mot. Summ. J. 20), meaning that it does not contend that Underwriters should have accepted a duty to defend under a reservation of rights, *id.* at 20 n.4 (citing *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 619 (2d Cir. 2001)).

which the insurer may be held liable for indemnification." *Zurich Am. Ins. Co. v. ACE Am. Ins. Co.*, 165 A.D.3d 558, 558 (N.Y. App. Div. 2018).

"An insurer must give written notice as soon as is reasonably possible of its intention to disclaim coverage for bodily injury under a policy." *Liberty Ins. Underwriters Inc. v. Great Am. Ins. Co.*, No. 09cv4912, 2010 WL 3629470, at *9 (S.D.N.Y. Sept. 17, 2010) (internal citations omitted). In determining whether it must defend an action, "[i]t is perfectly reasonable that the insurer verify the surrounding facts so that, if it chooses to disclaim, it does so on the basis of concrete evidence." *Mount Vernon Fire Ins. Co. v. Harris*, 193 F. Supp. 2d 674, 678 (E.D.N.Y. 2002). Courts "measure the reasonableness of the delay 'from the point in time when the insurer first learns of the grounds for disclaimer of liability or denial of coverage.'" *U.S. Underwriters Ins. Co. v. City Club Hotel, LLC*, 369 F.3d 102, 107 (2d Cir. 2004). "Determining whether or not the delay in disclaiming was reasonable is generally a question of fact for the jury." *Harris*, 193 F. Supp. 2d at 677. An insurer "who delays in giving written notice of disclaimer bears the burden of justifying the delay." *City Club Hotel, LLC*, 369 F.3d at 107 (observing that New York courts have determined that "unexcused delay[s] of 48 days or longer is unreasonable as a matter of law"). Nonetheless, New York courts have determined that an insurer's disclaimer of a duty to defend "issued within a month after the insurer obtains sufficient facts to form the basis of the disclaimer is, as a matter of law, reasonable." *Great Am. Ins. Co.*, 2010 WL 3629470, at *9 (collecting cases).

**B.      Because Underwriters Was Not Obligated to Indemnify ChemTreat in the Windsor Action and Made a Timely Investigation of Whether Coverage Applied, It Did Not Breach Its Duty to Defend ChemTreat**

Underwriters was not required to defend ChemTreat in the Windsor Action because it properly disclaimed coverage on information extrinsic to the four corners of the Windsor Complaint, and did so in a timely and reasonable manner.

First, Underwriters denied coverage and a defense on information unrelated to the merits of the Windsor Action. As the United States District Court for the Southern District of New York has stated, "under New York law . . . extrinsic evidence cannot be used to defeat the duty to defend unless it is unrelated to the merits of the underlying plaintiff's action." *City of New York*, 2017 WL 4386363, at *15. Here, Underwriters use of extrinsic evidence—the pre-suit correspondence—to disclaim a duty to defend was unrelated to the merits of the Windsor Action. Rather, Underwriters properly disclaimed coverage based off ChemTreat's prior knowledge of the facts alleged in the Windsor Action and those facts potential for forming a claim. Thus, ChemTreat was permitted to disclaim coverage because "extrinsic evidence . . . plainly [took] the case outside the policy coverage."[21] *Striker Sheet Metal II Corp.*, 2018 WL 654445, at *9.

Second, the evidence shows that Underwriters timely investigated the surrounding facts and disclaimed coverage within a reasonable time after discovering the basis for disclaimer. Courts "measure the reasonableness of the delay [in denying coverage] from the point in time when the insurer first learns of the grounds for disclaimer of liability or denial of coverage." *City Club Hotel, LLC*, 369 F.3d at 107 (internal citation omitted). On October 17, 2017,

---

[21] The pre-suit correspondence from Mid-South and Windsor took the "case outside the policy coverage." *Striker Sheet Metal II Corp.*, 2018 WL 654445, at *9. The additional letters Mid-South and Windsor sent to other entities relating to the Explosion do not affect Underwriters duty to defend ChemTreat as that extrinsic evidence did not affect ChemTreat's knowledge on July 1, 2017—the Policy inception date.

43

ChemTreat notified Underwriters of the Windsor Action. (Borrero Aff. ¶ 29.) On November 16, 2017, one month later, ChemTreat forwarded to Underwriters copies of the pre-suit letters, which served as the basis for Underwriters' coverage denial. (Young Decl. ¶ 8; Dec. 15, 2017 Denial Letter 1.) On December 15, 2017, twenty-nine days later, Underwriters issued a letter denying coverage for the Windsor Action based on the three Policy exclusions. (Dec. 15, 2017 Denial Letter.)

Underwriters first learned about the grounds for disclaimer of its liability on November 16, 2017, when ChemTreat forwarded the pre-suit correspondence—twenty-nine days before Underwriters denied coverage. Underwriters' delay of twenty-nine days is reasonable as a matter of law. While questions of reasonableness in disclaiming a duty to defend are often decided by a jury, New York courts have routinely held that an insurer's disclaimer of a duty to defend "issued within a month after the insurer obtains sufficient facts to form the basis of the disclaimer is, as a matter of law, reasonable." *Great Am. Ins. Co.*, 2010 WL 3629470, at *9.

Accordingly, even taking into account Underwriters' broad duty to defend ChemTreat under New York law, *Burt Rigid Box, Inc.*, 302 F.3d at 97, because Underwriters reasonably denied coverage on grounds outside the four corners of the Windsor Complaint and did so in a timely and reasonable manner, Underwriters did not have a duty to defend ChemTreat in the Windsor Action.

### V. Analysis: Breach of Implied Covenant of Good Faith or Bad Faith

Having determined Underwriters had no duty to defend ChemTreat, the Court turns to ChemTreat's claim in Count II. In Count II of its Complaint, ChemTreat alleges that Underwriters failed "to act reasonably and in good faith," (Compl. ¶ 83), and instead "cast about for any possible excuse, no matter how weak or fanciful, to avoid their obligations to defend and

indemnify ChemTreat," (*id.* ¶ 81). As presented in the Complaint, it is unclear whether ChemTreat brings a claim for "breach of the implied covenant of good faith and fair dealing" or a claim of "bad faith" against Underwriters. Because ChemTreat fails to state a claim under either legal theory, the Court must grant the Underwriters Motion for Summary Judgment as to Count II.

First, if the Court interprets Count II as a claim for breach of the implied covenant of good faith and fair dealing, ChemTreat has failed to state a claim because Count II duplicates ChemTreat's breach of contract claim in Count I. Under New York law, every contract includes "an implied covenant of good faith and fair dealing." *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.*, 610 F.3d 44, 54 (2d Cir. 2010). However, "New York law does not treat a breach of the covenant of good faith and fair dealing claim as . . . *separate* from a breach of contract claim where the claims are based on the same facts." *Giller v. Oracle USA, Inc.*, 512 F. App'x 71, 73 (2d Cir. 2013) (emphasis in original). Therefore, any "cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is intrinsically tied to the damages allegedly resulting from a breach of the contract." *Deer Park Enters., LLC v. Ail Sys., Inc.*, 57 A.D.3d 711, 712 (N.Y. App. Div. 2008) (internal citation and quotations omitted).

In Count I, ChemTreat alleged that Underwriters breached their duty to indemnify and defend ChemTreat. In Count II, ChemTreat similarly alleges that Underwriters "cast about for any possible excuse, no matter how weak or fanciful, to avoid their obligations to defend and indemnify ChemTreat." (Compl. ¶ 81.) The damages sought in Count I, resulting from Underwriters failure to indemnify and defend ChemTreat, thus mirror the damages sought in Count II. If the Court interprets Count II as a claim for breach of the implied covenant of good

faith and fair dealing, under New York law, because Count II is premised on the same set of facts as ChemTreat's breach of contract claim, it is redundant and must be dismissed. *See Those Certain Underwriters at Lloyd's, London v. DVO, Inc.*, No. 1:19cv00252, 2020 WL 4060109, at *20 (W.D.N.Y. July 20, 2020) (finding a breach of implied covenant of good faith and fair dealing claim "wholly duplicative" when based on the same set of facts as an underlying breach of contract claim); *Deer Park Enters., LLC*, A.D.3d at 712 (finding breach of implied covenant of good faith and fair dealing claim duplicative where "the conduct and resulting injury alleged" was identical to breach of contract claims alleged in complaint).[22]

Second, if the Court were to interpret Count II as a claim for "bad faith" failure to comply with an insurance contract, ChemTreat would not state a claim because New York does not recognize an independent tort for willful violation of an insurance contract. As the United States District Court for the Western District of New York has stated, "New York does not recognize an independent claim for first-party bad faith refusal to comply with an insurance contract, viewing it as duplicative of a claim for breach of the covenant of good faith and fair dealing." *H&H Envtl. Sys., Inc. v. Evanston Ins. Co.*, No. 6:18cv06315, 2019 WL 1129434, at *8 (W.D.N.Y. Mar. 12, 2019); *see also Paterra v. Nationwide Mut. Fire Ins. Co.*, 38 A.D.3d 511, 513 (N.Y. App. Div. 2007) ("[T]here is no separate tort for bad faith refusal to comply with an insurance contract . . . .").[23]

---

[22] This claim would fail for an additional reason: Underwriters had no duty to indemnify or defend ChemTreat. Thus, it could not breach the implied covenant of good faith and fair dealing in denying insurance coverage that did not exist.

[23] Underwriters correctly notes that New York does recognize a claim against an insurer where the insurer refuses to settle an insurance action in bad faith, but that exception does not pertain. (Mem. Supp. Underwriters Mot. Summ. J. 20.) Even if ChemTreat alleged that Underwriters had failed to settle the Windsor Action in bad faith, which it does not, that claim could not prevail as "a claim of bad faith [refusal to settle] must be predicated on the existence of coverage of the loss in question." *Zurich Ins. Co. v. Texasgulf, Inc.*, 233 A.D.2d 180 (N.Y. App.

Therefore, whether brought as a claim for breach of the implied covenant of good faith and fair dealing or as a claim of bad faith, ChemTreat fails to state a claim as to Count II. The Court will grant the Underwriters Motion for Summary Judgment as to Count II.

### VI.  Conclusion

For the foregoing reasons, the Court will grant the Underwriters Motion for Summary Judgment and will deny the ChemTreat Motion for Summary Judgment.

An appropriate Order shall issue.

_____
/s/
M. Hannah Lauck
United States District Judge

Date: 09/21/20
Richmond, Virginia

---

Div. 1996).  "[A] mere arguable basis for the insurer's denial of coverage has been sufficient to defeat, as a matter of law, a claim of bad faith."  *Id*. at 181.  Here, the Court has determined that the Policy exclusions barred coverage for the Windsor Action; therefore, Underwriters basis for denying coverage was, at the very least, "arguable" and any claim of bad faith failure to settle could not apply.  *Id*. at 180–81.